**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAROLINA NATURAL GAS CORPORATION, Respondent.**

**No. 11176.**

United States Court of Appeals Fourth Circuit.

Argued June 1, 1967.

Decided Nov. 10, 1967.

---

Malcolm D. Schultz, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N. L. R. B., on brief) for petitioner.

Young M. Smith, Hickory, N. C. (Emmett C. Willis, Hickory, N. C., on brief) for respondent.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

SOBELOFF, Circuit Judge:

The National Labor Relations Board seeks enforcement of the order it issued upon its finding that the Carolina Natural Gas Corporation violated section 8 (a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (5) by refusing to bargain with the duly elected representative of its production and maintenance employees. Resisting enforcement, the Company challenges the validity of the representation election and the resulting certification of the International Chemical Workers Union.

In August, 1964, the Union filed a standard petition with the Board's Regional Director in order to initiate representation proceedings. A representation hearing was held to ascertain the employees who would be entitled to vote at the proposed election.

At the hearing, Company Vice-President in charge of operations, James Buchanan, in response to questioning by counsel, enumerated and described employee classifications, which the Company contended comprised "production and maintenance employees." Although 17 employment categories were discussed, "order dispatchers and field clerks" was the only job designation which went completely undescribed. The sole allusion to these employees in the record is Buchanan's three-word affirmative response to a question propounded by company counsel asking only whether the Company employed "order dispatchers and field clerks." This colloquy occurred approximately mid-way through Buchanan's exposition of the duties of his company's employees. At the conclusion of Buchanan's direct examination, company counsel moved the inclusion into the bargaining unit of "those people and those jobs who have been described by the witness." The union representative stipulated to their incorporation. Later in the hearing, the Company's counsel stipulated that office clericals were to be excluded from the unit.

As a result of the hearing, the Regional Director ordered a secret ballot election for "[a]ll production and maintenance employees of the Employer * * *, excluding office clerical employees, professional employees, guards and supervisors as defined in the Act." Of the 47 employee votes cast at the subsequent election, 22 supported the Union, 20 opposed it, and 5 were challenged by the Union as clerical workers not within the unit. The Regional Director upheld the challenges and certified the Union. Following the Board's affirmance, the Company's refusal to bargain, the General Counsel's complaint and the Company's answer, the Trial Examiner granted the General Counsel's motion for judgment on the pleadings since he found no need for an evidentiary hearing. The Board affirmed and issued the order, enforcement of which is sought here.

The Company has refused to obey the order on the grounds that the challenges were improperly sustained and that the election was vitiated by procedural irregularities and electioneering. Its primary contentions are that the Union should be bound by its stipulation to include field clerks within the unit and that a hearing must be held to determine the validity of the election. We find no merit in either contention and enforce the Board's order.

The stipulation regarding the field clerks was so shrouded in ambiguity as to merit no binding effect. Nine job classifications had been described in some detail by Mr. Buchanan before the fleeting reference to field clerks, following which six more categories were fully explored. When Mr. Buchanan terminated his direct testimony, the attention of both counsel centered on the disputed seventeenth category of welders, who apparently had some supervisory functions. It was in this setting that the Union's counsel was asked to stipulate as to those categories "described." Not only was there no description of the duties of field clerks, but there was also no identification of the people who served

in that capacity. In illuminating contrast is the stipulation of company counsel that office clericals were to be excluded. Immediately before that stipulation, Buchanan identified each person within the category and gave a detailed analysis of her duties. In light of the circumstances surrounding the stipulation regarding field clerks, the Regional Director cannot be faulted for independently investigating the disputed category or for subsequently sustaining the challenges.

The Director's investigation, which offered all parties a full opportunity to submit and present written evidence, revealed a close similarity between the duties of field clerks and office clericals and a wide divergence between the activities of production and maintenance employees and those of field clerks. Like the excluded office clericals, all five of the challenged field clerks are women. In describing the other 16 categories, Mr. Buchanan continually referred to the workers as men, an understandable choice of language in light of the duties of these workers. Buchanan's list included gas pipe layers, ditch diggers, appliance installers, welders, servicemen, warehousemen, regulator repairmen and deliverymen. The Director found that the primary functions of a field clerk are to keep records, receive and relay telephone calls from the customers to the servicemen and to collect money. The five employees in question spend up to 95 per cent of their time in an office, which they leave only to deliver a service order to a serviceman or to take in freight.

Of course, the Board has the primary responsibility for marking out the appropriate unit for the purpose of representation proceedings. General Instrument Corp. v. NLRB, 319 F.2d 420 (4th Cir. 1963), cert denied, 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964). An examination of the factual underpinnings of the Board's decision completely dispels the contention that the Board has abused its discretion or acted arbitrarily or capriciously. Moreover, the

Board's inclusion of field clerks with office clericals is in accordance with its customary practice in the utility industry. See Montana-Dakota Utility Co., 115 N.L.R.B. 1396 (1956).

■ The Company contends that the Board, by virtue of the Union's stipulation, has lost its power to determine the appropriate unit. To this end, it cites NLRB v. Schapiro & Whitehouse, 356 F.2d 675 (4th Cir. 1966); NLRB v. J. J. Collins' Sons, Inc., 332 F.2d 523 (7th Cir. 1964) and NLRB v. Joclin Manufacturing Co., 314 F.2d 627 (2d Cir. 1963). These cases are inapposite. In each of the cited cases, the stipulation was entered into as part of the expedited "consent election" procedure. As a result, each of the stipulations was written and signed only after apparent analysis and deliberation. Those stipulations amounted to full-fledged agreements, reflecting a true meeting of the minds. The contracts, as Judge Friendly termed them in the *Joclin* case, were either extremely precise as to the job categories or they incorporated listings of specific individuals who comprised the unit. Furthermore, each of those agreements was specifically approved by the Board. The oral, extemporaneous, highly ambiguous and unapproved stipulation here has nothing in common with those dealt with in the cited cases and should not preclude the Board from making an independent investigation into the appropriate unit.

■■ It is true that at no stage in the proceedings was the Company granted an evidentiary hearing to prove the procedural irregularities and electioneering which it contends invalidated the election. However, this is not *ipso facto* a sufficient reason for denying enforcement. An essential prerequisite to the right to a hearing is something to be heard. See NLRB v. Bata Shoe Co., 377 F.2d 821 (4th Cir. 1967); NLRB v. Air Control Products of St. Petersburg, Inc., 335 F.2d 245 (5th Cir. 1964). The Rules and Regulations of the Labor Board provide that there is a right to a hearing only where there is a "substantial and material factual issue" which can only be resolved at such an inquest. 29 C.F.R. 102.69(c); NLRB v. O.K. Van Storage, Inc., 297 F.2d 74 (5th Cir. 1961). As noted by the Second Circuit, such a requirement is "not only proper but necessary to prevent dilatory tactics by employers or unions disappointed in the election returns * * *." NLRB v. Joclin Manufacturing Co., supra at 314 F.2d. 632. As will be shown, the Company's allegations here appear to be no more than the dilatory maneuvers this screening device was designed to combat.

■ The first, and by apparent implication weightiest, procedural irregularity asserted by the Company is a 37-minute delay in holding the election. Scheduled for four o'clock, the voting did not begin until twenty-three minutes to five. The Regional Director's investigation revealed that the late start was occasioned by the Board Agent's being delayed in another labor matter. Neither in its brief nor elsewhere does the Company allege any specific adverse effect on the election from this delay. There is no particularized claim of confusion at the poll or departures by any of the electorate. The Director found the delay inconsequential, and we agree.

■ The two electioneering incidents complained of are similarly innocuous. It is contended that before the balloting began a union representative accosted a small group of voters standing fifteen feet from the polling place. There is no allegation as to what was said or what impact his presence had, if any. When asked to leave, he did so immediately. In the second incident, either the union observer or the Board Agent said "There's my boys" as some of the workers approached the voting table. The Company avers that the factual dispute over which of these two men made this statement necessitates a hearing. In our opinion, it makes no earthly difference which of them called out. The isolated remark and the union representative's brief conversation could not possi-

bly have had the effect, singly or cumulatively, of impairing the employees' freedom of choice. Consequently, the Board was well within its province in finding a free election. NLRB v. Shirlington Supermarket, Inc., 224 F.2d 649 (4th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955).

 Just as the burden of establishing a substantial and material question of fact requiring a hearing was on the respondent, so the onus of proving that the election was conducted improperly rests upon it. NLRB v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961). The Company has failed to discharge either burden. Even if the evidence at a hearing were to prove the Company's frivolous assertions, as a matter of law there would be no justification for setting aside this election. NLRB v. Air Control Products of St. Petersburg, Inc., supra.

The Board's order is enforced.

Enforced.

BOREMAN, Circuit Judge (dissenting):

I most respectfully state my disagreement with my brothers insofar as their opinion deals with the Union's challenges of the ballots of the five employees who were classified as "order dispatchers and field clerks" and insofar as it affirms the Board's decision upholding the challenges and refusing to permit the challenged ballots to be counted. The result is all-important to the parties involved in that it rejects the Company's principal defense to the charge that it violated the Act by refusing to bargain.

To a matter of such importance there should be a more realistic approach without overlooking or minimizing the pertinency of established facts. The total number of employees is quite small although the operations of the Company are spread over several counties. Including the five employees whose votes were rejected there were only about forty-five employees eligible for inclusion in an appropriate bargaining unit. The Union had conducted an organizing campaign among the employees and from common knowledge necessarily acquired by those who constantly deal with such procedures, the conclusion is inescapable that within a very short time the organizers would have become acquainted with the individuals comprising such a small group and would have familiarized themselves with the location of each employee and the nature of the duties and services performed by or rendered by each. With my own knowledge, admittedly limited and acquired largely from cases before us on review, I could not easily be persuaded otherwise. No particular expertise is required in reaching such a conclusion.

There is no dispute that, at the representation hearing, one of the seventeen employment categories mentioned by the company representative was that of "order dispatchers and field clerks." A separate and distinct classification which was discussed was that of "office clericals." [1] Each of five girls whose votes were challenged was employed in one of the five branch offices serving the area of the Company's operations. They were not identified by name but neither were the office clericals named. The five were classified by the Company as "order dispatchers and field clerks." If there had been any question it could have been pursued by the union representative

1. The company representative, upon inquiry, described "office clericals" by location and by a description of employment duties as follows: "Upstairs in our building [in the main office at Hickory] we have one young lady who takes care of invoices, one who takes care of payrolls, and also making checks, paying invoices; we have another young lady who is a general office worker, and we have one lady who is in charge of the billing, customers' bills; downstairs we have three girls who act as cashiers, making work orders; we have one lady who is a combination stenographer for myself and the sales manager, industrial sales manager; and I believe that's all."

It was stipulated that these, so classified, would be excluded from representation in the bargaining unit.

who cross-examined the company representative at length and in detail concerning the identification and duties of other employees in other classifications. No question was raised by the union representative or by the Hearing Officer as to those to be included in the now disputed classification.

One of the seventeen categories mentioned and discussed at the representation hearing is not here involved. As to the remaining sixteen categories the Hearing Officer asked the union representative: "Do you agree that those categories that were listed, and classifications, should be included in the unit?" The answer was: "Yes, sir." The Officer then inquired: "Do you so stipulate?" and the union representative replied: "I so stipulate, and I want to include these two, what he called welder foremen." Later there was a discussion with reference to certain welders who were described by company representatives as foremen and claimed to be ineligible for inclusion in the bargaining unit.

At the conclusion of the hearing the respective representatives of the parties and the Hearing Officer reviewed the proceeding as follows:

"(Union Representative) Well, the only disagreement we have is over the welder foremen, or leader welders, and I think the record has enough information in there for them to settle that, so I'll forego any argument."

The company representative, in answer to the Hearing Officer's inquiry, stated: "I take the same position as Mr. Wilson [the union representative], I think the contents of the record will be adequate, for the Board to determine the ruling on the welder foremen, Donnell and Williams."

Thereafter, the Board's Regional Director, following a review and analysis of the transcript of proceedings, issued his Decision and Direction of Election in which he affirmed the Officer's rulings, finding them to be "free from prejudicial error." Further, he determined that "[t]he parties are in essential agreement as to the composition of the unit and *disagree only with respect to the unit placement of three hourly-paid employees who work with crews * * *."* (Emphasis supplied.) He directed an election by the variously classified employees in the unit who had been declared to be eligible.

Since twenty-two votes were cast for the Union, twenty against the Union and five votes were challenged, the outcome of the election was contingent on the uncounted votes. By direction the Company had provided a list of eligible voters in alphabetical order and by job classification and it was available for inspection by representatives of the Union at a pre-election conference held at the voting place. It was then that the union representative asked to see the list of eligible voters and he and an employee, Robert W. Deffenbaugh, who was a union adherent and was acting as an election observer for the Union, took the list some distance away from the Board Agent's table and conferred together for some minutes, returning the list to the Agent with check marks in ink after seven names on the list and cross marks in ink in front of three others. The Agent explained to them the official purpose of the list and its use by the Agent and the observers and further explained that they had no right to mark it up. At his request an unmarked carbon copy was then provided. It was after this conference and during the progress of the voting that the ballots of the five "order dispatchers and field clerks" were challenged.

At the time of asserting the challenges the Union charged that the challengees were *office clericals* and thus ineligible. However, the supplemental decision made after an investigation contained the statement:

"The petitioner [Union] contends that *it had not intended to stipulate to the inclusion of the order dispatcher-field clerks; their agreement was to the inclusion only of those whose duties*

*were described in the record.* The petitioner had stipulated to the exclusion of office employees and contends that the classification in issue falls within the office clerical definition." (Emphasis added.)

The record fails to disclose that the Union filed any statement of its contentions or position or a pleading or paper of any sort other than the petition for election and the charge against the Company, both of which were handled favorably for the Union by the Board. The investigation conducted by the Regional Director was ex parte and the information received from the challenged voters was contained in statements made out of the presence of the Company's representatives without any opportunity to question them with respect to their assigned duties or in any other particular. The Regional Director concluded that in the Company's operations there are two separate groups of *clerical* employees, that those employed in the Hickory office are classified as office clericals while those clericals employed in the various branch offices are known as "order dispatcher-field clerks." He further concluded that the challengees were classified as "order dispatcher-field clerks." His final conclusion, however, as contained in his report, was that the challengees "are office clerical employees and the challenges to their ballots should be and hereby are sustained." Furthermore, it is a matter of pertinency that the Regional Director stated in his report that "the evidence presented by the Employer and otherwise adduced in the investigation shows no community of interest between the order dispatcher-field clerks and the service personnel located in the various branch offices." Just what evidence was presented *by the Company* is not clear. The Company did cooperate with the investigator in making the challengees available to him for questioning. But no representative of the Company was permitted to be present and the manner and method of presenting or developing the "evidence" are not explained although it is undisputed that the "evidence" to which reference is made was gathered by the investigator alone. There was no hearing called or arranged for the purpose of obtaining information which the Regional Director apparently sought. Not included in the report or elsewhere in the supplemental decision is there any review, analysis or redetermination of the meaning, significance, or effect of the accepted stipulation relating to the "order dispatchers and field clerks." Insofar as the record discloses, on the eligibility list prepared by the Company for use at the election there were no employees who were classified as "order dispatchers and field clerks" other than the five challengees.

These challengees who work in the Company branch offices undoubtedly do work in the enclosed office area as reported by the Regional Director but that is not dispositive of the question here nor is it persuasive. From that area they collect money from customers in payment of their bills; undoubtedly they serve customers and patrons in many ways; they take and record service and installation calls and requests from customers and prospective customers; they deliver service orders to the servicemen; they take in freight deliveries; they keep records and inventories of the supplies at the branch offices; they keep routine records pertaining to the sale and distribution of natural gas. Their work was closely related to the service employees who were installing and repairing equipment in the field. Obviously, they take orders from their superiors and are undoubtedly subject to some supervision in their routine employment which would be necessary in the operation of a branch office located at some distance from the Company headquarters. But it seems that there were no branch managers, as such, except that in most instances salesmen performed some supervisory duties and gave some orders covering routine affairs. But there is nothing appearing which indicates that these challengees are in any way closely connected with management or that in their clerical work they receive any con-

fidential information which naturally comes to the attention of certain classes of clericals working in close relationship with company officers and supervisors who are responsible for many and varied phases of company operation and policy. This court has recognized "confidentiality" as an important factor in distinguishing between clericals who are deemed eligible or ineligible for inclusion in an appropriate bargaining unit. N.L.R.B. v. Quaker City Life Insurance Company, 319 F.2d 690, 694 (4 Cir. 1963). It would appear that, in itself, the classification of these challengees as order dispatchers and field clerks would best describe the duties assigned to and performed by them.

Thus, it is my conclusion that the Union repudiated its stipulation and that the effectiveness of the stipulation which, in my opinion, recognized and established the right of the five challengees to vote in the election, was destroyed. Such repudiation of a solemn stipulation should not be countenanced. Stipulations were urged by the Hearing Officer in the representation proceeding and the Board's Rules and Regulations, Section 102.66 (29 C.F.R. 102.66), specifically authorize the use of such stipulations in these proceedings. The Board, in its published Statements of Procedure, Section 101.20(c) (29 C.F.R. 101.20(c)), formally indicates that such stipulations are repeatedly utilized in the majority of Board representation cases.

It is not open to contradiction that *there was a stipulation that order dispatchers and field clerks were to be included in the bargaining unit.* It clearly appears that the five challengees were classified by the Company in that category. If there were any doubts, ambiguities or uncertainties, or if there were any misunderstandings, clarification could have been obtained at that hearing by the union representative or the Hear-

ing Officer by asking a few simple questions. The Company stated, without equivocation, that it *did* have employees classified as order dispatchers and field clerks. There was no interrogation of the company representative as to the identity or the location of these employees. Without further exploration the Union stipulated that such employees would be included in the bargaining unit. No question was raised until the list was submitted by the Company on election day and then challenges were interposed only after the union representative had conferred with the one regular company employee selected by the Union as its observer. Could it be that this employee had received disturbing information with respect to the attitude of the five challengees concerning union representation which indicated that they, if permitted to vote, would cast their ballots *in favor* of the Company and *against the Union?* What might have been developed in this connection if company and union representatives had been permitted to participate in the Regional Director's investigation? Were the challenges prompted by last minute information relayed by the employee observer to the union representative rather than by a good faith doubt as to the eligibility of the challengees as qualified members of the bargaining unit as stipulated? All these questions remain unanswered and the only efficacious method of ascertaining the correct answers to such important questions would be through an adversary hearing in which both the Union and the Company could be properly represented and could participate in questioning and cross-examining the witnesses.

Absent further appropriate proceedings I conclude that the Company was justified, under the circumstances, in refusing to recognize the Union as the properly selected bargaining representative and in refusing to bargain.