NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HARRY T. CAMPBELL SONS' CORPORATION, Respondent.

No. 11670.

United States Court of Appeals Fourth Circuit.

Argued Feb. 6, 1968.

Decided Feb. 27, 1969.

Richard S. Rodin, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N.L.R.B., on the brief), for petitioner.

William J. Rosenthal and Earle K. Shawe, Baltimore, Md. (Joseph K. Pokempner and Shawe & Rosenthal, Baltimore, Md., on the brief), for respondent.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

This case is before us upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. Sec. 151, et seq.), for enforcement of its order directing respondent, Harry T. Campbell Sons' Corporation (hereinafter Company), to bargain with two labor unions [1] which had been certified, after a Board conducted election, as joint representatives of certain of the Company's employees [2] in one relatively small unit (calcite) of a large stone quarry operation of the Company at Texas, Maryland. The Board's Decision and Order are reported at 164 NLRB No. 36.

The Company admits its refusal to bargain but defends on the ground that the Board erred in finding and concluding that the Company had violated sections 8(a) (5) and (1) of the Act by its refusal to bargain in view of the fact that the Board's underlying bargaining-unit determination is not supported by substantial evidence on the record considered as a whole. The Company takes the position that the Board acted unreasonably, arbitrarily, and capriciously in selecting the employees in only the calcite operation as an appropriate unit for collective bargaining purposes.

Here, the determination of an appropriate unit for collective bargaining was made after a hearing on a petition for an election filed by the Unions in Board Case No. 5–RC–5634. At the hearing the parties agreed to incorporate the record in Board Case No. 5–RC–4947, an earlier proceeding involving the same parties and the same issues. Case No. 5–RC–4947 culminated in a Board conducted election in which a majority of the eligible voters at the Company's calcite operation rejected union representation by a vote of 57 to 31. More than a year later, in No. 5–RC–5634, the same Unions petitioned for an election in the same calcite operating unit consisting of approximately 80 to 90 hourly rated employees. The Company contended that the *minimal appropriate unit* was one that included approximately 280 to 290 hourly rated employees at the entire Texas, Maryland, stone quarry operation of which the calcite operation was an integral part. The Regional Director found that the calcite unit, sought to be represented by the Unions, was appropriate for collective bargaining. The Company filed with the Board a request for review of the Regional Director's Decision and Direction of Election which request was summarily denied by the Board. At the ensuing election the Unions received a majority of the votes cast and the Unions were duly certified as bargaining representatives of the eligible employees in the calcite unit.

FACTS

There is little dispute as to the historical facts. The main point of disagreement is with respect to the relevancy and materiality of certain facts to

---

1. Local No. 37, International Union of Operating Engineers, AFL–CIO, and Laborers' District Council of Baltimore and Vicinity, Laborers' International Union of North America, AFL–CIO. These will be referred to in the text as the Unions.

2. All hourly rated production and maintenance employees at the Company's calcite plant at Texas, Maryland, including plant clerical employees, truck drivers, and laboratory technicians, but excluding all office clerical employees, professional employees, guards, and supervisors as defined in the Act.

be considered in deciding the ultimate question—whether the Board's approval of the employees at the calcite operation alone as an appropriate bargaining unit is supported by the record when considered in its entirety.

For an understanding of the later discussion herein it is necessary to recite the facts in some detail. The Company's central headquarters and general offices are located at Towson, Maryland, which is approximately five miles from the Texas, Maryland, quarry operation. At Towson are housed the Company's real estate, engineering, purchasing, selling, cost accounting, billing, payroll (including payroll records), and employee relations departments. President, Robert B. Hamill, and vice-presidents, S. James Campbell, Bruce S. Campbell, Jr., and Harry G. Campbell, Jr., are in overall charge of the Company's day-to-day operations. These individuals act as a management committee with each of the three vice-presidents being responsible for management of various operations, acting in an advisory capacity to the president and carrying out the decisions and policies of the committee. All quarry and stone-crushing operations are under Bruce Campbell. In addition to the Texas quarry operations, the Company has smaller, scattered operations located at White Marsh, Westminster, Marriottsville, and Gwynns Falls, all in the State of Maryland. The ready-mix operations at White Marsh, the quarry equipment and ready-mix trucks at Texas, as well as the shops which maintain this equipment, are also under the direction of Bruce Campbell. The road construction, road equipment and black-top operations report to Harry Campbell. James Campbell is responsible for the "calcite" and "sackrete" operations. The Regional Director found that "These officers act as a management committee in deciding all basic Employer policies, including those in the area of industrial relations." The president and 'all of the vice-presidents are directly and intimately involved in employee relations, fringe benefits, hours of work, wage rates and increases, credit, traffic control, purchasing, financing, and the many other areas relating to the operation of the entire business.

There is common control at Towson over the sales of all operations. All accounting, cost accounting, billing, purchasing, engineering, and real estate acquisition, maintenance and management are centralized at the Towson office. None of these functions is performed at the various operations. The separate operations make up delivery tickets for product deliveries but a copy of each ticket is sent to the Towson office. All telephone calls to any of the company operations go through the central switchboard at Towson. All company facilities are connected by radio-telephone. Mail is picked up and delivered to all the separate facilities by men from the Towson office. In the centralized purchasing operation the management committee makes the decisions as to the purchase of all equipment based upon the recommendation of the individual vice-president in charge of the particular operation involved. All legal problems are handled through Towson. Company trucks are assigned to the various facilities, as needed, by the truck fleet superintendent at Towson. The trucks are all the same color and bear the same or similar markings on the sides. The traffic manager, who is located at the calcite facility at the Texas operation, controls the deliveries made by trucks from all operations.

Thus, it is clear from the record that all of the Company's facilities and operations are dependent upon centralized management and that not even the overall quarry facility at Texas, much less the calcite segment thereof, functions independently of the direction, control and services provided from central headquarters in Towson.

So that the Texas, Maryland, quarry operations may be better understood there is appended to this opinion a reproduction of an aerial photograph, Company's Exhibit 7, showing the geographic

lay-out and integration of the total Texas operations.[3]

All of the Texas operations revolve around the operation of the quarry which contains a large sulphite stone deposit (calcium carbonate). The calcite operation, the limestone operation, the bluestone operation, and the ready-mix concrete operation are all dependent upon the quarry for their existence. Without the quarry there would be no such operations. The testimony of Bruce Campbell to the effect that the calcite operation is entirely dependent upon the quarry for its supply of stone is uncontradicted.

Edward Reichart, the superintendent of the quarry, is responsible for all of the physical facilities at Texas, including calcite, and all of the facilities use the same power and water supply, the same heating oil, same oil, gas, and tire repair station, same roads, same entrances, same exists, and the same parking area. The Company provides free bus service to and from Towson for the employees engaged in all of these operations. One safety engineering program covers all Texas operations and each separate facility has a representative on an appropriate committee.

Many of the products at calcite are similar to or interchangeable with products handled at the other Texas facilities. The calcite laboratory performs tests for the quarry for hardness of material and analyses of various kinds as well as tests for the other products at the Texas operations. Calcite operations employees are used for unloading machinery and bagged material coming in by rail for other Texas operations.

The company Director of Employee Relations, Killon, with an assistant and two clerical employees, administers the personnel and labor relations policies in the central administrative offices at Towson. Killon spends approximately half of his time going around to the various locations and handles any complaints or grievances as to working conditions or fringe benefits. He also answers questions on company policy which may be brought to him by supervisors at any of the various facilities based upon inquiries from employees. All personnel records are maintained at the central office, including records of employees' seniority which is based on length of service with the Company and is Company-wide. An employee who is transferred from any one of the Company's facilities or operations to another retains his Company-wide seniority which can be used to "bump" an employee with less seniority.

Hiring is done through the Towson personnel office and Killon has the responsibility of procuring personnel upon request from various company facilities.

3. The locations of the various facilities have been marked for identification on the attached photographic reproduction of Exhibit 7. At the upper left-hand corner of the photograph is the actual stone deposit. Just below the stone deposit, in the lower left-hand corner, is a group of buildings encircled and marked by the letter A. This represents the calcite facility and, as stated, the employees of this facility were determined by the Board to constitute an appropriate bargaining unit. Directly adjacent to calcite, approximately 35 feet away, is the company's ready-mix concrete operation, encircled and marked by the letter B. Adjacent and slightly to the rear of the ready-mix concrete location is the crushed-stone operation, encircled and marked C–1, C–2, and C–3. The crusher marked C–3 crushes rock and concrete aggregate as well as calcite. The maintenance shop, located adjacent to ready-mix, is marked by the letter D. The letters E–1, E–2, F, and G mark the truck storage garages, the carpenter shop, and the gas and truck service station. The Company's four screening facilities for road and concrete aggregates are marked H–1, H–2, H–3, and H–4. In the upper right-hand corner is the Company's small shop (road equipment) marked I. In the lower right-hand corner, marked J, is the Company's black-top operation. The letters K and L represent storage areas, with L being specifically used by calcite for the storage of a special calcite product known as "reflectolite." The railroad spur that serves the calcite operation, the concrete operation, and the quarry is seen in the foreground of the photograph.

All applicants for employment fill out the same applications and take physical examinations. While it is true that they sometimes apply directly to a certain facility they must fill out the proper forms and take the physical examination. Killon maintains all applications and medical records and processes these items in the course of screening applicants for employment. He has the right to reject any applicant who does not meet the required standards during a 60-day probationary period. Killon has this veto power even if a facility supervisor desires to hire an applicant and he has exercised this power on numerous occasions at the calcite facility. When men are being laid off from one operation it is Killon's responsibility to attempt to place them, if possible, at another company operation.

From the central personnel office each company employee receives an identification card, various forms, handbooks, a payroll deduction card, and brochures explaining benefits. The central payroll department administers the payroll savings plan, bond deduction plan, and purchases of additional insurance for employees at all facilities. Uniform safety and first aid programs throughout the Company are administered by Killon. A safety committee is established at each location; at the Texas quarry a calcite employee represents the calcite operation on the committee. Before an employee who has been injured may return to work at any company operation he must clear through Killon's office and he may be required to submit to a physical examination.

The management committee, consisting of all company vice-presidents, controls wages and fringe benefits. This committee reviews wages twice yearly and, for the past several years, has given a general, bi-yearly, across-the-board increase to employees at all company operations. The committee evaluates and reviews all company operations where merit adjustments are needed to bring certain categories of employees in line with other employees doing similar work. Individual merit increases are coordinated and reviewed by the vice-president having responsibility over a particular operation and by the superintendent of that operation. Pay checks for employees at all facilities are prepared at Towson and drawn on the same acccount, the checks being identical in form. Health and welfare insurance policies for employees and a supplemental sick plan are uniform throughout the Company. There is a uniform retirement program for which employees at all facilities may qualify and the criteria and qualifications are the same for all employees. Rules of conduct for all company employees are uniform.

Employees receive a discount on all purchases and each employee receives a Christmas bonus. Each employee's vacation is based on his company-wide seniority as to duration. It is fair to say, however, that those employees in separate operations may, in order of seniority, choose the time when the vacation will be taken. Each company employee receives the same number of paid holidays.

Similar job classifications exist at all company locations. For example, at Texas the calcite operation employs laborers (approximately two-thirds of the work force), drivers, laboratory technicians, plant operators, crusher operators, plant clericals, mechanics, welders, electricians, maintenance men, fork-lift operators, and shipping clerks. The quarry operation at Texas employs laborers, drivers, shovel operators, plant operators, equipment operators, loader operators, crusher operators, dispatchers, plant clericals, and shipping clerks. The Texas concrete operation employs laborers, drivers, dispatchers, and plant clericals. The blacktop operation employs laborers, plant operators, equipment operators, laboratory technicians, maintenance men, dispatchers, and plant clericals. The large shop employs laborers, drivers, helpers, plant clericals, mechanics, welders, electricians, carpenters, plumbers and dispatchers. The smaller shop has employees classified as laborers, drivers, equipment op-

erators, mechanics, welders, painters and plant clericals. Clearly established is the fact that at the Texas over-all operations there are uniform job classifications embracing employees performing essentially the same duties and functions and who are readily interchangeable.

The quarrying and handling of the white stone (calcite) present an example of the manner in which the production and maintenance employees at the Texas operation work together. The Company employs an outside contractor to drill holes in the face of the quarry wall. These holes are loaded with dynamite by quarry employees working under the supervision of a blasting superintendent, the dynamite being furnished by an outside company. After the stone is blasted, a power shovel operated by quarry personnel moves in and the stone is loaded on a dump truck to be transported to the primary crusher. After the material is run through the primary crusher it is loaded on a truck driven by a quarry employee who takes the large sized stones to calcite or, in the case of the smaller stones, to a stockpile to be later picked up by quarry personnel and equipment and transported to the calcite facility. The stone delivered to calcite is placed on a conveyor belt which transports the stone past calcite pickers who remove the bluestone which is then conveyed on another belt to a tank. The calcite driver then hauls the bluestone away and dumps it where it becomes available for use by the other Texas operations. "Rip rap," a coarse form of stone, is separated and returned to the quarry for sale. The white stone (calcite), which has remained, proceeds through crushers, up an elevator and is there separated into various sizes and stored in tanks. Some of the material is then taken out of the tanks and treated with a wet process. After this treatment the material is then "dewatered" and bagged. Most of the bagged material is stored at calcite

although a special product known as "reflectolite," used mainly for roofing, is hauled to another area of the Texas operation for storage. Loading from the calcite storage areas is performed by quarry trucks driven by quarry drivers whose trucks are loaded by quarry-manned front-end loaders.[4]

Some interchange of employees exists among those employed at the Texas operations. There is some disagreement as to the extent of this interchange, the Board claiming that the interchange is insubstantial, the Company claiming that the interchange is quite substantial. There was evidence introduced to show that for the year 1965 there were 67 direct labor transfers involving the calcite operation and for the period from January 1, 1966, through May 1966 there were 47 direct labor transfers involving calcite. The employees involved for varying periods of time were equipment operators, laborers, and truck drivers from other areas of the quarry working in and out of the calcite operation. Through a period of several years prior to 1965 there were several permanent transfers into or out of calcite and for the period from January 1, 1965, through June 1966 there were 27 permanent transfers among the Company's total operations with eight permanent transfers involving the calcite operation. There was evidence to show that the shop personnel at Texas are constantly working at the calcite operation, many times under calcite supervision. Records kept by the Texas shop show that the shop is constantly furnishing various supplies and equipment to calcite employees for use at calcite. These transfers involve constant contact between the employees of the two operations.

On numerous occasions quarry personnel work alongside or in conjunction with calcite employees, performing work for calcite. As an example, when quarry front-end loaders are used to load the

---

4. The Board itself points to the testimony of Bruce Campbell to the effect that about eight to ten percent of the calcite employees have some on-the-job contact with other Texas quarry employees during the daily operations of the plant.

trucks of customers who have come into calcite for a load of stone, quarry personnel operate their equipment to load the customer's truck since calcite has no front-end loaders. A calcite employee accompanies the customer's truck to the particular stockpile where it is loaded by the front-end loader. The bulk truck expediter is a calcite employee but spends most of his time with equipment operators from the quarry assigning various loads to the bulk trucks.

Some large repair jobs on the calcite crushers are done by the quarry mechanics. The carpenters, plumbers and other maintenance people stationed at the Texas shops work at all facilities and frequently at the calcite operation. The electrician on the maintenance crew at calcite is under the direct supervision of the master electrician at the quarry shop. Whenever any of the construction employees from the quarry shop are working at calcite on a construction project they would normally be working under the direction of the calcite manager.

It is true, and the Board emphasizes, that the calcite plant is the only company operation which runs "certain of its segments" on a regularly scheduled, seven-day, three-shift basis and "other segments" on a regularly scheduled two-shift basis. Of course, the market demand for the particular product bears heavily upon the effort necessary to supply the demand and work scheduling in this and other operations would be the business of management in view of existing or changing circumstances.

## DISCUSSION

The Board argues that our decision in this case must be controlled by the application of the broad general principle that the determination of *an* appropriate bargaining unit is a matter committed to the Board's discretion under Section 9(b) of the Act and that the Board's determination is entitled to stand unless "arbitrary or capricious." [5] It insists that there is a vast difference between "*an* appropriate unit" and "*the* appropriate unit"; that the unit selected in this case was well within the bounds of its discretion.

Courts, generally, have gone far in upholding the Board's selection and designation of bargaining units in close and somewhat doubtful cases. On occasions this court has gone to extremes in its efforts to accept and uphold Board determinations in cases which were not wholly free from doubt but where there was some evidence reasonably tending to show that, at least, the purposes of the Act, the fostering of industrial peace and stability, through collective bargaining, would not be thwarted by such acceptance. On the other hand, it has been recognized in court decisions, and by the Board itself, that there is a limitation on the Board's power in determining collective bargaining units. This limitation arises out of the plain language of the statute. Section 9(b) gives the Board the power to determine the matter of collective bargaining units according to a stated standard: "The Board shall decide in each case * * * *in order to assure to employees the fullest freedom in*

5. The Board cites the following cases: N. L. R. B. v. Jones & Laughlin Steel Corp., 331 U.S. 416, 422–423, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); Florence Printing Co. v. N. L. R. B., 333 F.2d 289, 291 (4 Cir. 1964); Overnite Transportation Co. v. N. L. R. B., 327 F.2d 36, 39–40 (4 Cir. 1963).

Further, the Board points to our own decisions in N. L. R. B. v. Quaker City Life Ins. Co., 319 F.2d 690, 693 (4 Cir. 1963); and Corrie Corp. of Charleston v. N. L. R. B. (and cases cited therein), 375 F.2d 149 (4 Cir. 1967), where it was held that in many cases there is no "right unit" and the Board's choice among alternative appropriate units will not be disturbed unless the choice has been made in a manner violative of the statute.

*exercising the rights guaranteed by this Act*, the unit appropriate for the purposes of collective bargaining * * *." (Emphasis added.) The rights guaranteed by the Act are found in Section 7, as follows:

"Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing * * * and shall also have the right to refrain from any or all of such activities."

The Board has recognized the manner in which these guaranteed rights limit its decision-making power. An articulate statement appears in Kalamazoo Paper Box Corp., 136 NLRB 134, 137 (1962), as follows:

"As we view our obligation under the statute, it is the mandate of Congress that this Board 'shall decide in each case * * * the unit appropriate for the purpose of collective bargaining.' In performing this function, the Board must maintain the two-fold objective of *insuring to employees their rights to self-organization and freedom of choice in collective bargaining and of fostering industrial peace and stability through collective bargaining*. In determining the appropriate unit, the Board delineates the grouping of employees within which freedom of choice may be given collective expression. At the same time it creates the context within which the process of colective [sic] bargaining must function. Because the scope of the unit is basic to and permeates the whole of the collective-bargaining relationship, *each unit determination, in order to further effective expression of the statutory purposes, must have a direct relevancy to the circumstances within which collective bargaining is to take place. For, if the unit determination fails to relate to the factual situation with which the parties must deal, efficient and stable collective bargaining is undermined rather than fostered*." (Emphasis supplied.)

At pages 139–140 the Board continued:

" * * *. Moreover, our determination here * * * rests upon a finding required by the pertinent facts presented that *the employees sought do not have such special and distinct interests as would outweigh and override the community of interest shared with other plant employees*. In these circumstances, * * * [an erroneous decision with respect to the scope of a bargaining unit] would result in creating *a fictional mold within which the parties would be required to force their bargaining relationship*. Such a determination could only create a state of chaos rather than foster stable collective bargaining, and could hardly be said to 'assure to employees the fullest freedom in exercising the rights guaranteed by this Act' as contemplated by Section 9(b). * * *." (Emphasis supplied.)

The congressional statutory mandate has been similarly interpreted by the courts. In administering the Act, the Board is expected by the courts to effectuate the objectives of the statute, including employee freedom of choice and stable collective bargaining, not only with reference to the bargaining unit but other issues as well. N. L. R. B. v. Glen Raven Knitting Mills, Inc., 235 F.2d 413 (4 Cir. 1956); N. L. R. B. v. Frisch's Big Boy Ill-Mar, Inc., 356 F.2d 895 (7 Cir. 1966); N. L. R. B. v. Purity Food Stores, Inc., 376 F.2d 497 (1 Cir.), cert. den., 389 U.S. 959, 88 S.Ct. 337, 19 L.Ed.2d 368 (1967). Over an extended period the Board has based its determination of the appropriateness or inappropriateness of a bargaining unit upon the presence or absence of what it has characterized as a substantial mutuality of interests in such matters as wages, hours of work, and working conditions.

The Board persists in referring to the calcite operation as the calcite "plant." But, as testified by Bruce Campbell, "The word plant around Texas only refers to separate buildings." As is demonstrated in the photographic copy of Company Exhibit 7 appended hereto, the

Texas operation is not made up of individual "plants" in the true sense of the word and this case does not involve the question of a multiplant versus a single-plant unit. A more accurate statement is that all of the facilities at the Texas quarry constitute but a single "plant." The Board's position that calcite occupies a separate location apart from the other operations in the area is to ignore what is clearly shown in the photograph. The only thing separate about calcite's location is that the Company's other Texas facilities were not constructed on top of it. As close as 35 feet away from calcite is the ready-mix concrete operation. Almost as close are the maintenance shops, truck storage garages, and carpenter shop.

For emphasis, we review the factual situation which we deem pertinent to a correct decision of the ultimate question. The calcite operation is entirely dependent upon the quarry and its supply of stone and without such source calcite would have to cease operation as would the Company's limestone, bluestone, and ready-mix concrete operations. Clearly the quarry is not for the private use of calcite. There can be no doubt, on the record in this case, that the quarry, from which calcite receives all of its raw materials, is used as a common source of supply by the other Texas operations. Quarry employees work alongside or in conjunction with calcite employees, performing work for calcite. Quarry front-end loaders are used to load the trucks of customers coming to calcite for stone. A calcite employee accompanies the customer's truck to the particular pile where it is loaded by a quarry employee operating a quarry front-end loader. The bulk truck expediter is a calcite employee but spends most of his time with equipment operators at the quarry, assigning various loads to the bulk trucks. Calcite operators work with quarry drivers who dump stone into the calcite crusher. The calcite operators coordinate with the driver, telling him to bring stone from the stockpile, when to dump and when not to dump

stone into the crusher. The calcite crusher foreman instructs quarry truck drivers as to the piles of stone from which they should haul to the calcite crusher. Calcite "pickers" separate "rip rap" from the other stone and return this larger stone to the quarry for sale. A special product, reflectolite, is originally removed from the quarry in a rough state, refined at calcite, and then taken by truck to a storage section in another Texas area shared by other Texas operations. The shop personnel at Texas are under the general supervision of the quarry supervisor and repair jobs on calcite crushers are performed by quarry mechanics. Carpenters, plumbers, electricians, and other maintenance personnel working out of the Texas shops service calcite as well as other of the operations. Job classifications are almost uniform throughout all the Texas operations. A Company bus picks up Texas employees at Towson, transports them to Texas and returns them to Towson at the end of the workday. Two railroad spurs serve the several Texas operations in common. All wage rates, fringe benefits, hours of work and so on are fixed by the management committee which oversees all of the Texas operations and decides on basic policies in the area of industrial relations. All accounting, billing, purchasing, engineering, real estate, traffic control, and personnel administration for the Texas operations are handled at general headquarters in Towson. All employees at Texas work in the same area at operations that are physically located within a distance of feet from each other. There is interchange and contact among Texas employees. Calcite operators are coming in contact with other employees at Texas in the loading and unloading of stone from the quarry, the loading and unloading of railroad cars, the loading of customers' trucks and on numerous other occasions such as during transportation to and from work, the lunch hour, rest breaks, maintenance and repair, and so on. We cannot disgard the fact that there is an extraordinary degree of integration and interdependence, both from

an operational and personnel standpoint, at the Texas facility.

This court's position was clearly stated by the late Judge Soper in N. L. R. B. v. Glen Raven Knitting Mills, Inc., 235 F.2d 413, 415 (4 Cir. 1956), as follows:

"Obviously it is to the advantage of the employees in general that all of them shall have the right to participate in decisions affecting their interests through representatives of their own choosing and that this right is jeopardized if a selected group of employees, without whom the business cannot be carried on, is empowered to bargain separately for its own interests with the possibility of an ensuing strike regardless of the wishes of the workers in other sub-divisions of the enterprise. *Unity of interest, common control, dependent operation, sameness in character of work and unity of labor relations have led the Board and the courts in many cases to approve the inclusion in a bargaining unit as many employees as possible who have a common interest.* * * *." (Emphasis supplied.)

The Board has repeatedly held that the employees working at a particular physical site cannot be appropriately represented for purposes of collective bargaining separate and apart from other employees with whom they regularly interchange and with whom they enjoy a close community of interests based on common wages, working conditions, common skills and common supervision, particularly where the entire operations of the employer are integrated.[6]

The Unions here certified lost one election in which the employees in the calcite operation alone participated. However, after a considerable lapse of time they won a second election. Un-

doubtedly the isolation and concentration of these employees in a collective bargaining unit made it possible for the Unions to win the election. But winning an election is, in itself, insignificant unless followed by stable and successful negotiations which may be expected to culminate in satisfactory labor relations. Making a distinction among employees at the calcite operation and the other employees at the Texas operations, where no real distinction exists, tortures the plain meaning of the Board's prior decisions, eliminates the possibility of effective and stable collective bargaining, and imposes the will of a minority on the majority of the Texas employees and deprives the majority of its guaranteed right of freedom of choice.

Advertising to Kalamazoo Paper Box Corp.,[7] we are not unmindful of the statement of the Board that it looks "to the factual situation with which the parties must deal." This statement was made in describing the Board's decision-making function. The Board, in brief and oral argument, concedes that there is *some* degree of "geographic proximity, centralized control of management, and common administration and personnel policies involving the calcite plant and other installations at Texas." Frankly, in looking to the factual situation here we find a highly integrated, interdependent, and interrelated single quarry operation employing approximately 280 to 290 employees with similar wages, working conditions, job classifications, fringe benefits, with over-all central management and control. In no one of the Texas operations can there be found even the shadow of autonomy. There is simply no way in which the interests of the calcite employees can be disassociated from their fellow employees at Texas and vice versa.

6. L & S Construction Company, Inc., 155 NLRB 524; Halstead and Mitchell Company, 151 NLRB 1460; Texas Instruments, Incorporated, 145 NLRB 274; McCulloch Corporation, 149 NLRB 1020. See, however, Sav-On Drugs, Inc., 138 NLRB 1032, where the Board found as

an appropriate bargaining unit the employees in one store in a multi-store, city-wide chain. There the Board noted substantial geographical separation of the units, substantial authority of each store manager, and minimal interchange.

7. 136 NLRB 134, 137 (1962).

If the Board's selection of the appropriate bargaining unit in this case were to stand and bargaining is undertaken, neither party on the stage at the bargaining table could overlook the fact that standing in the wings are more than 200 other employees of the same employer, employees who cannot be separated in terms of labor relations from the small group of employees directly involved in the bargaining negotiations. The Company would be required to measure any economic proposal submitted for its consideration with reference to the cost of extending the same proposed concessions to its other Texas employees. At the same time the Company would be compelled to evaluate the risk of a strike and the economic possibilities involved. The bargaining Unions would be influenced and, perhaps, controlled by this economic reality, by their natural interest in representing the other Texas employees and by their concern that other labor organizations not compete with them among the other employees. The Board here has created "a fictional mold within which the parties would be required to force their bargaining relationship." In the language of *Kalamazoo Paper Box Corp., supra,* such a determination "could only create a state of chaos rather than foster stable collective bargaining" because in the "fictional mold" the prospects of fruitful bargaining are overshadowed by the prospects of a breakdown in bargaining.

Apart from the frustration of the statutory objective of stable collective bargaining, what of the unrepresented employees' freedom of choice, including their freedom to choose their own representatives? In the event that bargaining for calcite employees were unsuccessful and produced a state of chaos, the more than likely result of a "fictional mold" for bargaining purposes, the remaining employees at the Texas operations would almost necessarily become involved. A picket line at calcite would undoubtedly embroil the remaining employees in a dispute with Unions selected without their participation and which do not represent them although their interests are the same as those employees directly involved. Because of the integrated and interdependent nature of the Texas operations a labor dispute at calcite would undoubtedly severely disrupt the operations of the remaining facilities, causing economic hardship to employees not involved in the dispute but dependent upon the uninterrupted functioning of the quarry operations. This is neither the encouragement of stable collective bargaining nor is it collective freedom of choice as contemplated by the Act.

In N. L. R. B. v. Purity Food Stores, Inc., 354 F.2d 926, 931 (1 Cir. 1965), the court, in remanding the case to the Board, used language of pertinent application here:

"In argument before us counsel seeks to justify the Board's decision by stating that employees who wish to unionize should be permitted to do so. We do not question that. *Consideration, however, should also be given to the consequences to employees similarly situated who apparently do not wish to unionize, but who would inevitably be affected, basically, by the union's activities.* It is only if it is reasonable to regard the employees elsewhere in the chain differently in the light of the total circumstances that there is a true majority vote. *We believe, also, that there should be some minimum consideration given to the employer's side of the picture, the feasibility, and the disruptive effects of a piecemeal unionization."* (Emphasis supplied.)

We reach the conclusion, upon consideration of the record as a whole, that the Board's selection and approval of the bargaining unit as sought by the Unions was ill-advised, arbitrary and capricious. The employees in the calcite operation were, in our opinion, neither *the* appropriate unit nor *an* appropriate unit for collective bargaining. We further conclude that the Company was justified in refusing, as it did, to bargain and that the order of the Board should not be enforced.

Enforcement denied.

APPENDIX

WINTER, Circuit Judge (dissenting):

I agree with the majority that in a case of this nature our limited function is to determine whether substantial evidence in the record as a whole supports the Board's determination that a designated bargaining unit is *an* appropriate unit. Certainly, we need not determine *the* appropriate unit; nor need we determine a more appropriate unit than that designated by the Board.[1] In performing that function, I cannot conclude that the Board's designation of the calcite employees as *an* appropriate unit "was ill-advised, arbitrary and capricious."[2] I think the designation is supported by the requisite quantum of evidence and was well within the Board's wide discretion in such matters. I would enforce the Board's order.

### I

Lest the record seem completely one-sided, I recite the evidence which supports the Board's designation:

1. In important respects, the calcite operation is physically separated from the other operations. While it is true that the calcite operation is carried on at Texas, Maryland, where other activities are also conducted, and the raw material for the calcite operation is extracted from the same quarry as the raw material for other operations, the extent of integration between the calcite operation and other operations is extremely limited.

As described by the Board, the accuracy of whose statement is not questioned:

"At its Texas location, the Employer, as heretofore noted, operates a quarry containing a calcium carbonate deposit, a white stone. The Employer hires an outside contractor to drill holes in the face of the quarry wall. These holes are loaded with dynamite by Campbell employees working under the supervision of a blasting superintendent supplied by the dynamite company. After the stone is shot a power shovel loads the stone on a truck. A driver transports all the stone to the primary crusher. The stone is then crushed and the larger pieces are transported and dumped into a hopper at the calcite plant. The flow of the material to the hopper is controlled by the calcite plant foreman and by visual observation made by the truck driver. The smaller stone is transported by another driver to the calcite plant or to a stockpile for future use at calcite. *Up to this point the work has been performed by Texas quarry personnel and equipment and there has been little, if any, contact between Texas quarry personnel and calcite personnel.* The dumped stone is then conveyed by belt past pickers who are on the calcite plant payroll. These employees pick out the bluestone which is then conveyed on another belt to a tank. A calcite plant driver trucks the blue-

1. As we said in Singer Sewing Machine Company v. N. L. R. B., 329 F.2d 200, 202, 12 A.L.R.3d 775 (4 Cir. 1964): "Our function is not, as Singer apparently suggests, to determine what other units could be considered as appropriate ones, or what unit we in the first instance, would fix were the decision to be ours. Our function is to determine whether there has been a misapplication of law, lack of substantial evidence, or abuse of discretion in the determination made by the Board. If none of the latter are found, the Board's determination must stand, for it is the Board which has the discretion and the responsibility for deciding whether a unit is appropriate for purposes of collective bargaining; and its deter-

mination, if supported by substantial evidence and within the bounds of law, is binding on us."

See also, Florence Printing Co. v. N. L. R. B., 333 F.2d 289, 291 (4 Cir. 1964); Corrie Corporation of Charleston v. N. L. R. B., 375 F.2d 149, 154–155 (4 Cir. 1967), and cases cited therein.

2. As a collateral matter, I sharply dispute the majority's characterization that "this court has gone to extremes in its efforts to accept and uphold Board determinations in cases which were not wholly free from doubt" in the matter of unit designation. Unless the instant decision is to signal a complete change of direction, blanket indictment of what we have previously decided is unwarranted.

stone and dumps it in an area near the primary crushers or at the west side of the quarry. The white stone (calcite) which has remained proceeds through crushers, up an elevator, is separated into various sizes and stored in eight or nine tanks. Some of the material is then taken out of the tanks and treated with a wet process. After treatment the material is dewatered and bagged. Some of the material is bagged without the necessity of going through the wet process. Sections of the plant are used for the warehousing of the bagged material. *From the time that the material is dropped into the hopper until the time it is stored in the warehouse areas of the calcite plant or loaded on common carriers only calcite production employees are involved.* However, some of the material, especially reflectolite used for roofing, is not stored at the calcite plant, but is stored in an area somewhat removed from the plant, but still at the Texas location. This material is hauled to that location by a calcite plant employee in a calcite truck. On occasions a calcite plant employee will accompany a truck driver to the reflectolite storage area where a Texas quarry front loader operated by a Texas quarry employee will load the truck. The loading operator takes approximately three or four minutes. *In general only about eight to ten percent of the calcite plant employees have on-the-job contact with Texas quarry employees.* If rip rap, large stone not used by the calcite plant, but set aside by calcite pickers for return to the Texas quarry for sale, is considered a calcite product, 20 percent of the calcite plant products are utilized by other Employer operations. If rip rap is not included as a calcite plant product not more than five percent of calcite's products are used at other Employer facilities. The balance of calcite's products are sold to the Employer's customers." (emphasis supplied).

Manifestly, the calcite operation is very much self-contained; the mechanics of its functioning are little different than they would be if it were located several miles from the quarry.

2. Management, while heavily centralized, does divide primary responsibility. Again as stated by the Board, and not disputed:

"The Employer's operations are under the overall supervision of President Robert B. Hamill, and Vice-Presidents S. James Campbell, Bruce S. Campbell, Jr. and Harry G. Campbell, Jr. These officers act as a management committee in deciding all basic Employer policies, including those in the area of industrial relations. However, each vice-president is responsible for certain phases of the Employer's operations. Thus, Bruce S. Campbell, Jr. is responsible for all quarry, stone, ready-mix cement operations, ready-mix trucks and the shops which maintain this equipment. Harry G. Campbell, Jr. is responsible for road construction, which is divided into private and public road construction, road equipment and blacktop operations. S. James Campbell is responsible for the sakrete and calcite operations."

3. The number of transfers of employees to and from the calcite operation is insubstantial. Over all, there are 280 to 290 employees at the entire operation at Texas, Maryland; 80 to 90 work in the calcite operation. For the period 1950 through 1964, there were only 30 permanent transfers either into or out of the calcite operation. These involved approximately 22 employees. In the next succeeding 18-month period, there were 8 transfers in 1965 and none in the first six months of 1966.

4. Hiring, promotion, firing and disciplinary actions are largely self-contained. The employer maintains general uniform labor relations policies and maintains a personnel department at its general offices at Towson, Maryland. However, all calcite personnel are hired at the calcite operation premises, subject to a physical examination and an investigation of the employment application. Promotions of calcite personnel are normally

made from employees within the unit upon recommendation by calcite supervisors. Disciplinary action and discharge are recommended or made by calcite supervisors. Their actions can be appealed to top company officials, but their actions have never been reversed. No layoffs have occurred at the calcite operation, but the employer's policy concerning layoffs is to restrict them to the plant or operation involved. A junior calcite employee would thus not be laid off to avoid a layoff of another non-calcite employee having greater seniority. As a related matter, vacations are scheduled on the basis of seniority within each operating unit.

5. There are separate payroll and separate wage rates for calcite employees. For each operation conducted at Texas, Maryland, a separate payroll is maintained; the calcite operation constitutes one such payroll. Calcite employees punch a separate time clock. Although the employer uses company-wide job classifications, wage rates and job descriptions, the functions and duties of the employees within a given classification at its numerous operations vary. For example, two-thirds or more of the employees at the calcite operation are designated laborers but they do not perform the pick and shovel work performed by laborers on road construction gangs, nor do they receive the same rate of pay as laborers at the sakrete plant. The calcite operation is the only one which works, in part, on a regularly-scheduled two-shift basis, and, in part, on a regularly-scheduled 7-day three-shift basis. Employees involved in the shift operation receive a shift bonus. Laborers at the calcite operation are not paid on an incentive basis, as are laborers at the sakrete plant. Individual merit increases in wages are reviewed by the calcite operation supervisor and vice-president in charge of the calcite operation.

## II

In short, there is substantial evidence that calcite employees form a readily identifiable and distinct unit within the employer's operations, appropriate for the purpose of collective bargaining. Concededly, there is some degree of geographic proximity, centralized control of management, common administration and common personnel policies. But there is a substantial basis for distinction between them and employees of other operations, even though they may all be under the employer's umbrella-type job classifications. I sharply disagree that "no real distinction exists."

It is not correct, also, to conclude that the Board's designation in the instant case "tortures the plain meaning of the Board's prior decisions." Of course, what is or may be an appropriate unit is largely a factual question, and it is extremely rare that any given set of facts is ever exactly duplicated. But in analogous situations in which given units have been designated or have been held to be improper by the Board, I find no inconsistency in the Board's rulings. Bagdad Copper Co., 144 N.L.R.B. 1496 (1963); Texas Instruments, Inc., 145 N.L.R.B. 274 (1963); Halstead & Mitchell Co., 151 N.L.R.B. 1460 (1965); L & S Construction Co., 155 N.L.R.B. 524 (1965). The latter, which was a case in which a unit was found not appropriate, is relied on heavily by the employer in this case. I find it factually distinguishable. L & S was an affiliate of another corporation and the two, collectively, were engaged in the business of building roads. L & S would excavate, grade, place a gravel base for the road and install the curbs and gutters. The affiliate would put down the various road surfaces, using materials obtained from L & S or from a third affiliate. On every road project, there was common overall supervision, and any supervisor of either affiliate had the authority to take necessary disciplinary action against an employee of the other affiliate. The degree of common supervision and the close working relationship between employees of L & S and its affiliate were held to require that an appropriate unit include employees of both companies. Manifestly, the degree of integration in the L & S case was, as the Board found in this

case, considerably greater than that present herein.

The majority's conclusion that the Board's designation in this case "eliminates the possibility of effective and stable collective bargaining, and imposes the will of a minority on the majority of the Texas employees and deprives the majority of its guaranteed right of freedom of choice" is not justified. The interests of the calcite employees can be disassociated from other employees at Texas, and vice versa. Of course, there is some overlap of their interests; but they widely diverge in other respects. Whenever an appropriate unit is designated which is something less than an entire operation the potentially invidious effects posited by the majority are present in greater or lesser degree. Bargaining for the unit we indicated would be appropriate in *Singer* would be bound to have its effects upon Singer's other employees in the exercise of their § 7 rights. In the instant case, if all of the employer's laborers were deemed an appropriate unit, irrespective of their duties, the operation in which they were employed and their historical wage structure, the results of bargaining on their behalf would unquestionably have an effect on other employees, as, for example, to encourage or discourage them to engage in concerted activities, to provide economic pressure for a wage increase or decrease depending upon the success of the laborers' bargaining, to present them with the problem of whether to cross a picket line if the course of the collective bargaining process were to result in a strike and myriad other examples. The same is true with regard to supervisors who, under the Act, are ineligible to be members of any unit. But, on the facts of this case, I can see no greater or lesser problem with regard to other employees than in the numerous cases in which *an* appropriate unit is less than the *entire* operation.

### III

In the view I take of this case, it is necessary to deal with three other issues not reached by the majority.

The employer complains that the Board was in error in affirming adverse rulings of the hearing officer in the underlying representation cases that denied it the opportunity to present evidence in support of its contention that the unit finally designated was arrived at, solely or principally, on the basis of the extent of unionization among employees. Unquestionably, § 9(c) (5) of the Act prohibits the extent of unionization from constituting a controlling factor in the designation of an appropriate unit, and this Court has not hesitated to enforce this provision of the Act. Singer Sewing Machine Co. v. N. L. R. B., supra. I think *Singer* inapposite because the proffered testimony, even if received and believed, would fall short of establishing a transgression of § 9(c) (5). In substance, the proffer was that it was the union's general practice to seek a unit embracing all laborers, except where it did not believe that it had sufficiently ingratiated itself with a majority of all laborers, in which event it would seek a unit embracing only those laborers in which it could obtain a majority. Nothing in § 9(c) (5) prohibits a union from seeking any unit for any purpose which may motivate it. Section 9(c) (5) is a prohibition directed only to the Board. The proffered evidence would, at best, be so marginally relevant on the issue of whether the Board considered the extent of unionization in arriving at its unit determination that I would find no error in its exclusion.

The employer also complains of the Board's certifying jointly both Local No. 37, International Union of Operating Engineers, AFL–CIO, and laborers' District Council of Baltimore and Vicinity, Laborers' International Union of North America, AFL–CIO, as the collective bargaining agent, and denying the employer the right to adduce evidence that both unions would not function as a true bargaining agent but, rather, were parties to a joint agreement to set aside their traditional jurisdictions solely for purposes of organizational activity. In my

view, the Board decided both issues correctly.

It is not disputed that each of the unions is a "labor organization" within the meaning of § 2(5) of the Act, and the Board has held that two or more labor organizations can act jointly in representing employees in an appropriate unit, Florida Tile Industries, Inc., 130 N.L.R.B 897 (1961). The provisions of § 2(5) of the Act apply to the entity alone and not to limit the number; hence, when two unions act as a joint bargaining representative they constitute a labor organization within the meaning of the Act. N. L. R. B. v. National Truck Rental Co., 99 U.S.App.D.C. 259, 239 F.2d 422, 425 (1956), cert. den., 352 U.S. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547 (1957). On the issue of how the unions would conduct themselves in collective bargaining if they won the election, the proffered evidence was conjectural and premature. It could hardly justify a denial of certification, because once two unions have been certified jointly, the employer has a right to insist that they bargain in fact jointly for all employees in the unit. Vanadium Corp. of America, 117 N.L.R.B. 1390 (1957); Florida Tile Industries, Inc., supra; S. D. Warren Co., 150 N.L.R.B. 288 (1964), enf'd., 353 F.2d 494 (1 Cir. 1965), cert. den., 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966).

Lastly, the employer contends that the Board proceeded in violation of the Act by refusing to grant a hearing on the § 8(a) (5) unfair labor practice charge and by granting summary judgment. As our previous decisions establish, summary judgment is a proper vehicle for prompt determination of contested matters where there is no real issue of fact. N. L. R. B. v. Carolina Natural Gas Corp., 386 F.2d 571 (4 Cir. 1967); LTV Electrosystems, Inc. v. N. L. R. B., 388 F.2d 683 (4 Cir. 1968); N. L. R. B. v. Aerovox Corp. of Myrtle Beach, S. C., 390 F.2d 653 (4 Cir. 1968). Here, the refusal to bargain was predicated solely on the claimed inappropriateness of the bargaining unit designated by the Board. That issue, the appropriateness of the

unit, was the subject of two prior plenary representation hearings. The employer has not proffered or suggested any new relevant evidence. The only purpose to be served by a plenary § 8(a) (5) hearing was further delay; a purpose not properly cognizable by this Court.