**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SANDVIK ROCK TOOLS, INCORPORATED,
Petitioner,

v.                                                                    No. 98-2533

NATIONAL LABOR RELATIONS BOARD,
Respondent.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                                    No. 98-2692

SANDVIK ROCK TOOLS, INCORPORATED,
Respondent.

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-17991)

Argued: June 10, 1999

Decided: August 16, 1999

Before LUTTIG and KING, Circuit Judges,
and BUTZNER, Senior Circuit Judge.

_____

Petition for review denied and cross-application for enforcement
granted by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Charles I. Cohen, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Sandvik. Rachael Irene Gartner, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Linda A. Way-Smith, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Sandvik. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, Margaret Ann Gaines, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Pursuant to 29 U.S.C. § 160(f), Sandvik Rock Tools, Inc. ("Sandvik") petitions this court for review of the September 20, 1998 Decision and Order of the National Labor Relations Board ("NLRB" or "Board") that certified union representation of a group of Sandvik's employees. The NLRB has filed a Cross-Application for Enforcement of the Board's September 20, 1998 Decision and Order (the "Board's Order"). Because we hold that the Board did not exceed its discretion in determining the appropriate bargaining unit, we deny Sandvik's petition for review and grant enforcement of the Board's Order.

I.

On February 23, 1998, the Shopmen's Local No. 753 of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers ("Union") filed a Petition for Certification of Representation with the NLRB. The Union sought to represent the workers in Sandvik's Chemical Products Division ("CPD") and its

2

associated warehouse. Those workers comprise approximately one-half of the production and maintenance employees at Sandvik's Bristol, Virginia facilities. The Union narrowly won the ensuing election.

Subsequently, the Union filed an unfair labor practices claim against Sandvik, alleging Sandvik had violated the National Labor Relations Act ("NLRA") by refusing to bargain with the Union. Sandvik admitted it had refused to bargain, but defended its refusal on the ground that the NLRB had directed the election in an inappropriate bargaining unit. The Board rejected Sandvik's argument and, on September 20, 1998, ordered Sandvik to cease and desist from refusing to bargain, to bargain upon request, and to provide the Union with requested information. These proceedings followed.

II.

Sandvik, a Delaware corporation, owns and operates a three-building fabrication business in an industrial park in Bristol. Sandvik operates two divisions at this facility, the Mineral Tools Division ("MTD") and the CPD. Each division occupies its own building. A third Sandvik building serves as a warehouse. All three buildings are located in close proximity to one another.[1] Although separate signs identify the MTD and the CPD at the entrance to the industrial park, the three buildings share a common entrance and a common parking lot. The MTD and the CPD each employ approximately sixty persons.

The CPD and the MTD produce substantially different products. The MTD manufactures carbide insert tool products used in mining and construction rehabilitation. The CPD manufactures polyester resin cartridges that provide structural integrity to mined-out rock surfaces, and also manufactures sealants that form air barriers on cinder block walls. Sandvik maintains separate budgets and balance sheets for the two Bristol divisions. The divisions have separate managers, supervisors, and foremen, who report to the same Sandvik executive. The MTD and the CPD share common administrative and upper management personnel, and there is a single Human Resources Depart-

_____

[1] The NLRB Hearing Officer specifically found that the MTD building and the CPD building are located 220 feet apart. The warehouse is approximately 200 feet from the other two buildings.

3

ment. All Sandvik employees at Bristol, regardless of division, are governed by the same employee handbook and rules of conduct. All employees also receive identical benefits and operate on virtually identical pay scales. Both divisions use the same common carriers and company vehicles for shipping and receiving.

Job qualifications for new employees are similar for both the MTD and the CPD; however, the employees are trained in different skills and use different equipment once on the job. The two divisions also work on different shift schedules, with the MTD operating three eight-hour shifts per day and the CPD operating two twelve-hour shifts.

Although some employees have been permanently transferred from one division to the other, employees are not temporarily transferred between the MTD and the CPD. The employees of the two divisions participate in some activities together, such as safety meetings or company picnics, but they have separate facilities, break rooms, and cafeterias on the job.

The warehouse is physically connected to the CPD by a conveyor belt, and handles all of CPD's shipping and receiving functions. CPD and the warehouse routinely interchange employees, such as helpers, with each other. The MTD has its own shipping and receiving department and associated storage site that are located within the MTD building. Both divisions store their permanent records in the warehouse.

In 1984, the Union filed a petition to represent all of Sandvik's production and maintenance employees at the Bristol facility. The Union lost that election. Until this recent election, there has been no collective bargaining history at the facility.

Sandvik maintains here that, based on the apparent "community of interest" that exists between the MTD, CPD, and warehouse employees, the only plausible explanation for the Board's certification of a bargaining unit consisting solely of the CPD and warehouse employees is that the Board improperly relied on the extent of the Union's organization of those employees. Sandvik contends that, by placing

4

such reliance on the extent of the Union's organization, the Board abused its discretion.

III.

A.

Section 9(b) of the NLRA, 29 U.S.C. § 159(b), grants the NLRB the power to "decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." 29 U.S.C. § 159(b). The Supreme Court has long subscribed to the view that the NLRB possesses the widest possible discretion in determining the appropriate bargaining unit. Arcadian Shores, Inc. v. NLRB, 580 F.2d 118, 119 (4th Cir. 1978) (citing Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491 (1947)). This wide discretion reflects acknowledgment of the Board's expertise in such matters and its "need for `flexibility in shaping the [bargaining] unit to the particular case.'" NLRB v. Lundy Packing Co., 68 F.3d 1577, 1579 (4th Cir. 1995) (quoting NLRB v. Action Automotive, Inc., 469 U.S. 490, 494 (1985) (citation omitted)). It is also well established that there may be more than one appropriate bargaining unit within a single employment unit. Arcadian Shores, 580 F.2d at 119. As we have observed, "the Board is free to select any one of these appropriate units as the bargaining unit." Id. (citations omitted). An employer challenging the Board's selection has the burden to prove that the bargaining unit selected is "utterly inappropriate." Id. at 120.

Despite the grant of such wide discretion, the Board must still operate within its statutory parameters. Lundy Packing, 68 F.3d at 1580. The NLRA mandates: "In determining whether a unit is appropriate . . . the extent to which the employees have organized shall not be controlling." Id. Therefore, although the Board may consider the extent to which the employees have organized as one of many factors in determining the appropriate bargaining unit, it may not give the employees' extent of organization "controlling" weight. Id.

Instead, to test a bargaining unit's appropriateness, the NLRB has historically relied on the "community of interest" test. Id. That test

5

requires the Board to examine twelve equally important criteria in determining whether the employees seeking to be represented by the union share a sufficient community of interest to form an appropriate bargaining unit. Id. The twelve factors the Board must examine are the following:

> (1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

Id. (citing I.T.O. Corp. of Baltimore v. NLRB, 818 F.2d 1108, 1113 (4th Cir. 1987)).

B.

Applying the community of interest test in this case, the Board's Hearing Officer found that it was "readily apparent that the production and maintenance employees at the chemical and tool divisions share a community of interest." Sandvik Rock Tools, Inc. v. Shopmen's Local Union No. 753 of the Int'l. Assoc. of Bridge, Structural, Ornamental & Reinforcing Iron Workers, AFL-CIO, 11-RC-6254, slip op. at 5 (NLRB March 25, 1998) (hereinafter"Sandvik Slip Op."). Since the CPD employees were a subset of the CPD and MTD employees whom the Hearing Officer found shared a community of interest, the CPD employees themselves clearly share a community of interest. The Hearing Officer also found that the CPD and warehouse employees shared a community of interest. This finding was based on the warehouse's primary use for shipping and receiving CPD's products, the routine interchange between the two facilities, and the functional integration of the tasks performed by the two groups' employees. Id. at 3-4.

6

Sandvik argued before the Hearing Officer that the bargaining unit should include the MTD employees. Id. at 3. While acknowledging that the employer was contending that a unit of employees from both divisions would constitute "a more comprehensive appropriate unit," the Hearing Officer did not find the employer's argument on the point dispositive. Id. at 5. The Hearing Officer noted that the Board has long held that a single-plant unit is presumptively an appropriate bargaining unit, and determined that Sandvik had failed to overcome that presumption.**2** Id.

The Board has stated that the party opposing the unit bears the burden of overcoming this presumption. Red Lobster , 300 NLRB 908, 910 (1990). To determine if the party has rebutted the presumption, the Board examines factors such as the following: (1) control over daily operations; (2) extent of local autonomy; (3) similarity of skills, functions, and working conditions; (4) degree of employee interchange; (5) distance between locations; and (6) the facility's bargaining history, if any. ESCO Corp., 298 NLRB 837, 839 (1990). These factors generally overlap with the "community of interest" test, but as applied to the question of whether an employer has overcome the single-plant unit presumption, the Board's consideration of the functional -- as opposed to the administrative-- features of the employer's operations dominate. Cf. id.

The Hearing Officer comprehensively analyzed the proper factors

_____

**2** The Board has held the single-plant unit presumption to carry the day unless the unit "has been so effectively merged into a more comprehensive unit, or so functionally integrated, that it has lost its separate identity." See, e.g., Red Lobster , 300 NLRB 908, 910 (1990) (citations omitted); ESCO Corp., 298 NLRB 837, 839 (1990) (citations omitted).

Sandvik argues that the Board's condition for overcoming the single-plant unit presumption is too stringent. Even if Sandvik were correct that a lesser showing could rebut this presumption, Sandvik's argument that the MTD and CPD employees share a community of interest is insufficient as a matter of law to rebut the Board's decision. See Arcadian Shores, 580 F.2d at 120 (employer must show "utterly inappropriate" bargaining unit selection by the Board). We therefore do not decide whether the Board's standard for rebuttal of the single-plant unit presumption is correct.

7

in making his finding that Sandvik had failed to rebut the single-plant unit presumption. Sandvik Slip Op. at 5-6 (citations omitted). The Hearing Officer determined that: (1) the two divisions lacked common supervision; (2) the divisions were not functionally integrated; (3) MTD had infrequent contact with the CPD and warehouse employees; and (4) there was only a minimal interchange and transfer of employees between the two divisions. Id. Countervailing facts such as the MTD's physical proximity, similarity in employee wages, fringe benefits, and personnel practices, as well as the centralized administrative functions of Sandvik, were found by the Board not to outweigh the operational autonomy distinctions. Id.

C.

Sandvik does not contest the Board's determination that the CPD and the warehouse constitute a single-plant unit. Rather, Sandvik disputes aspects of the Board's fact-finding and contends that the employees' community of interest requires a multi-plant bargaining unit in this case.

1.

Sandvik contends that substantial evidence does not support the following findings of the Board: (1) that the two divisions' production processes are not functionally integrated, and do not use interrelated methods and technology; (2) that the CPD and the MTD lack common supervision; and (3) that the employees of the two divisions have "infrequent contact" and "minimal interchange." Sandvik asserts that the two divisions' products are integrated and functionally related because they are often used together by its customers. We are unpersuaded by these assertions, however, because the Board's test looks to whether the production processes of the two units are integrated and interrelated, and does not concern whether the products themselves are marketed, sold, or used together.

Next, Sandvik urges that the evidence of a higher level supervisor common to the CPD and the MTD is contrary to the Board's finding that day-to-day supervision is performed separately in the two divisions. Again, Sandvik misconstrues the nature of the Board's test

8

which looks to the nature of the employees' supervision at a daily operational level.

Finally, Sandvik contends its evidence shows more than infrequent contact and minimal interchange between the two divisions' employees. Based merely on Sandvik's evidence of annual joint company picnics, newly created joint committees, and other joint activities of unspecified frequencies, we cannot disagree with the Board's findings of fact.

2.

Sandvik argues that the bargaining unit is inappropriate on the facts here. In support of its argument, Sandvik analogizes the facts in this case to those in our decision in NLRB v. Harry T. Campbell Sons' Corp., 407 F.2d 969 (4th Cir. 1969), where we denied an enforcement action due to the "extraordinary degree of integration and interdependence" of a company's calcite and quarry operations. See Campbell, 407 F.2d at 977-78. In Campbell, the calcite operation was entirely dependent on the quarry. Id. at 977. The employees worked alongside and in conjunction with each other, with the quarry workers performing work for the calcite operation. Id. For example, quarry trucks driven by quarry employees brought stone to the calcite operation, accompanied by and under the specific direction of a calcite operator. Id. A company-wide personnel system also governed a uniform wages and benefits program. Id. The court concluded there was not "even the shadow of autonomy," and that there was "simply no way in which the interests of the calcite employees [could] be disassociated from their fellow employees . . . ." Id. at 978.

Although, as Sandvik contends (and the Board found), the CPD and MTD employees share a "community of interest," that alone is not enough to overcome the Board's unit determination. The "extraordinary degree of integration and interdependence" in Campbell made the two company operations inseparable, and thus justified overruling the Board. See Campbell, 407 F.2d at 977-78. That inseparability is not evident here. Although in Campbell the calcite operation could not exist without the quarry, here the two divisions produce different products that each sells directly to its own customers. Nothing in the record establishes that the MTD is essential to the CPD's operation.

9

Both divisions sell mining products to different customers, although there is an overlap in their customer base because they both market to the mining industry.**3**

Unlike in <u>Campbell</u>, where the employees had similar skills and routinely were exchanged between the two enterprises, the MTD and CPD employees' skills are different, and employee transfers are infrequent and tend to be permanent relocations. Unlike in <u>Campbell</u>, the two Sandvik divisions have separate business plans, budgets and financial statements, as well as separate production and management supervision. In sum, although the Sandvik divisions do share certain features with the <u>Campbell</u> units, particularly with regard to personnel administration and standards, there are substantial operating control distinctions between the CPD and the MTD.

Sandvik also relies in this case on various authorities in which courts have upheld the Board's approval of multi-unit bargaining units.**4** These decisions confirm the Board's decision-making authority and wide discretion, and are unpersuasive here, where Sandvik is required to show that the Board abused its broad discretion.

Sandvik further contends that, based on the NLRA's policy rationale to "promote industrial peace," only the larger bargaining unit should be certified.**5** While the Board's governing policy is instruc-

_____

**3** The Hearing Officer found that 85% of the MTD customers were also customers of the CPD.

**4** Sandvik cites several cases for the proposition that the NLRB has found a smaller bargaining unit inappropriate as compared to a larger unit: <u>NLRB v. Cell Agricultural Mfg. Co.</u>, 41 F.3d 389 (8th Cir. 1994); <u>NLRB v. Williams</u>, 195 F.2d 669 (4th Cir. 1952); <u>Neodata Product/Distribution Inc.</u>, 312 NLRB 987 (1993); <u>Alma Plastics Co.</u>, 265 NLRB 479 (1982); and <u>Caron Int'l, Inc.</u>, 222 NLRB 508 (1976).

**5** Sandvik's characterization of the NLRA's guiding policy is inexact, and diminishes the multiplicity of interests that the Act is intended to protect. The public policy embodied in the Act was enunciated in 1947 as follows:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free

tive, the policy does not prohibit appropriate smaller bargaining units, as the Board found appropriate here. Sandvik failed to meet its burden to prove that the unit selected is "utterly inappropriate." See Arcadian Shores, Inc. v. NLRB, 580 F.2d 118, 120 (4th Cir. 1978).

3.

Sandvik argues that the Board's decision violates NLRA § 9(c)(5), which prohibits the extent to which the employees have organized from being either the exclusive or controlling factor in defining the bargaining unit. See 29 U.S.C. § 159(c)(5). While the previous failed attempt to unionize the combined MTD and CPD suggests that the MTD employees are less pro-union than their counterparts in the CPD, that inference alone is insufficient to establish a § 9(c)(5) violation. See Arcadian Shores, 580 F.2d at 120. As in Arcadian Shores, the separation and independence between the functions of the workers within the bargaining unit and those outside is a reasonable basis for the exclusion of the latter. Id.

Sandvik argues unpersuasively that our decision in NLRB v. Lundy Packing Co., 68 F.3d 1577 (4th Cir. 1995), is factually analogous and controlling here. In Lundy Packing, the union certified a bargaining unit consisting of production and maintenance employees, but excluded the quality control employees who spent a large percentage of their working time on the production floor alongside the production and maintenance employees. Lundy Packing, 68 F.3d at 1580. We noted that the Board's purported "distinguishing factors" between the included and excluded workers did not in fact distinguish between the two groups, as some workers in the production and maintenance group had similar job characteristics as the quality control employees.

_____

flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151 (findings and declaration of policy).

11

Id. at 1580-81. We decided that these "meager differences" were problematic because the excluded employees' tasks were essential to the company's operation. Id. We also noted that the Board's past position as to those same employee classifications at other companies was inconsistent with its position in Lundy Packing, without any justification. Id. at 1582-83. We therefore concluded that the bargaining unit decision was impermissibly dominated by the extent of organization, and denied enforcement of the Board's order. Id. at 1582-83.

The Lundy Packing facts are simply not analogous to this case. Unlike the MTD employees here, the excluded employees in Lundy Packing performed tasks that were essential to the entire company's operation; the Board's ruling in Lundy Packing was inconsistent with its position in a long history of prior decisions; and the Board had no explanation for the inconsistency. The determinations underpinning our decision in Lundy Packing have not been demonstrated here. Consequently, we cannot say in this case that the extent of union organization was either the exclusive factor or the controlling factor in the Board's unit determination.

IV.

Pursuant to the foregoing, we are unable to conclude that the Board abused its discretion in connection with its September 20, 1998 Decision and Order. The petition for review is therefore denied, and the cross-application for enforcement of the Board's Order is accordingly granted.

PETITION FOR REVIEW DENIED AND CROSS-

APPLICATION FOR ENFORCEMENT GRANTED

12