UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TRADESOURCE, INCORPORATED,
<em>Petitioner,</em>

v.

NATIONAL LABOR RELATIONS BOARD,
<em>Respondent,</em>

PLUMBERS AND GASFITTERS, LOCAL 12, of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO,
<em>Intervenor.</em>

BUILDING AND CONSTRUCTION TRADES DEPARTMENT,
<em>Amicus Curiae.</em>

No. 00-1440

NATIONAL LABOR RELATIONS BOARD,
                              *Petitioner,*

                    v.

TRADESOURCE, INCORPORATED,
                              *Respondent,*

PLUMBERS AND GASFITTERS, LOCAL
12, of the United Association of
Journeymen and Apprentices of the          No. 00-1555
Plumbing and Pipe Fitting Industry
of the United States and Canada,
AFL-CIO,
                              *Intervenor.*

BUILDING AND CONSTRUCTION TRADES
DEPARTMENT,
                              *Amicus Curiae.*

On Petition for Review and Cross-application for Enforcement of
an Order of the National Labor Relations Board.
(1-CA-37771)

Argued: April 3, 2001

Decided: August 28, 2001

Before TRAXLER and GREGORY, Circuit Judges, and
Lacy H. THORNBURG, United States District Judge for the
Western District of North Carolina, sitting by designation.

Petition for review denied and cross-application for enforcement
granted by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Jonathan J. Spitz, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Atlanta, Georgia, for TradeSource. Julie Brock Broido, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Dinah Susan Leventhal, O'DONOGHUE & O'DONOGHUE, Washington, D.C., for Intervenor. **ON BRIEF:** Dion Y. Kohler, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Atlanta, Georgia, for TradeSource. Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Sally M. Tedrow, O'DONOGHUE & O'DONOGHUE, Washington, D.C.; Robert M. Cheverie, Thomas Brockett, ROBERT M. CHEVERIE & ASSOCIATES, P.C., East Hartford, Connecticut, for Intervenor. Nora H. Leyland, Jonathan D. Newman, SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C., Washington, D.C., for Amicus Curiae.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

TradeSource, Inc. petitions this court for review of the March 31, 2000 Decision and Order of the National Labor Relations Board (the "Board") determining that TradeSource violated § 8(a)(1) and § 8(a)(5) of the National Labor Relations Act, *see* 29 U.S.C.A. §§ 158(a)(1), (a)(5) (West 1998) (the "Act"), by refusing to recognize and bargain with the Plumbers and Gasfitters Local 12 (the "Union") after the Board rejected TradeSource's challenge to ballots cast by several voluntary union organizers and certified the Union as the exclusive bargaining representative. The Board cross-petitions for enforcement of its Decision and Order. For the reasons stated below, we deny TradeSource's petition for review and grant the Board's cross-petition for enforcement.

I.

TradeSource is engaged in the business of providing temporary workers to general contractors and subcontractors in the construction industry. In March 1998, the Union filed a petition with the Board, seeking to represent a bargaining unit of "all full-time and regular part-time plumbers" employed by TradeSource in a specified area surrounding Boston, Massachusetts.

Because the bargaining unit dealt with construction employees who were subject to sporadic employment, the parties stipulated prior to the election that the *Steiny/Daniel* criteria would be used to determine the eligibility of voters. *See Steiny & Co.*, 308 NLRB 1323, 1324-26 (1992); *Daniel Construction Co.*, 133 NLRB 264, 266-67 (1961), *as modified*, 167 NLRB 1078, 1079 (1967). Under this criteria, employees who were (1) employed by TradeSource for 30 working days or more within the 12 months preceding the eligibility date for the election or (2) had some employment with TradeSource during the 12-month period, and had been employed for 45 working days or more within the 24-month period preceding the eligibility date, were eligible to vote.

In June 1998, the Board conducted the representative election. Of the twelve eligible ballots cast, three were cast for the Union, four were cast against the Union, and five were challenged by TradeSource on the ground that they were cast by voluntary union organizers who had sought and obtained employment with TradeSource for the sole purpose of gaining voter eligibility and organizing the company for the Union. Consequently, TradeSource asserted, they were temporary employees who did not share a "community of interest" with the other unit members, and were ineligible to vote. The challenged ballots were cast by Union members John Broderick, Joseph Kierce, John Caissie, John McKenzie, and George Rourke. A hearing on the challenges was held in August 1998, at which time the parties stipulated that the ballot cast by Broderick was ineligible under the *Steiny/Daniel* criteria.

According to the evidence presented, Union members who had agreed to act as voluntary union organizers submitted a group application for employment with TradeSource in the fall of 1996. They

included Kierce, McKenzie, and Rourke. As part of its union-organizing efforts, the Union trains its members in the COMET (Construction Organizing Membership Education and Training) program in which members and others receive training in organizing techniques. Kierce had attended a COMET training program some years before applying to TradeSource, whereas McKenzie and Rourke attended a COMET training program after they applied to TradeSource. Caissie, who did not become a union employee until after he was employed by TradeSource, denied having attended such a program, but also agreed to act as a voluntary union organizer and received instructions on how to assist the organizing efforts.

McKenzie was unemployed when he applied for work at TradeSource. He was hired in January 1998, and worked intermittently until early May 1998 when he was laid off. Rourke was also unemployed when he applied for work at TradeSource, but was not hired until March 1998. He worked until April 1998, when he went on a prearranged vacation, and was not successfully placed by TradeSource after his return. Caissie accepted employment with TradeSource in March 1998, but was laid off in April 1998. After being laid off, each of the men obtained jobs with union signatory companies and never returned to work with TradeSource.

There appears to be no dispute that McKenzie, Rourke, and Caissie were voluntary union organizers; indeed, the Union notified TradeSource in March 1998 that the three men were acting as voluntary union organizers. Generally, union members are not permitted to work for contractors who do not have a collective bargaining relationship with the Union, but the Union may give its members permission to do so. In exchange for their agreeing to act as voluntary union organizers, these men were given permission by the Union to work for the non-unionized TradeSource. They were not, however, given direct monetary compensation or other employee-type benefits by the Union for their organizing efforts, nor did they hold any elected or appointed position with the Union.[1] Upon being hired, none of the men were given a specified date of termination, nor did they discuss

---

[1]McKenzie served on the Union's election committee in either 1996 or 1997, for which he received compensation, but was not a paid union organizer at the time of his hire by TradeSource.

any specific date on which they intended to leave employment. Had they voluntarily quit their employment with TradeSource, or been fired for cause prior to completion of their last job, however, they would not have remained qualified to vote under the *Steiny/Daniel* criteria. *See Steiny*, 308 NLRB at 1326.

At the conclusion of the hearing on the ballot challenges, the hearing officer recommended that the four votes be counted. The Board agreed, rendering the election 7-4 in favor of unionization. On November 17, 1999, the Board certified the Union as the exclusive-collective bargaining representative of all full-time and part-time plumbers employed by TradeSource in the selected cities and towns in Massachusetts. TradeSource, however, refused to recognize and bargain with the Union or furnish information requested by the Union in its role as bargaining representative, prompting the instant charge by the Board's General Counsel alleging violations of §§ 8(a)(5) and (1) of the Act.[2] In response, TradeSource has admitted its refusal to bargain and to furnish information, but contests the validity of the certification based upon the ballots of Caissie, McKenzie, and Rourke.[3] The NLRB delegated its authority to a panel of the Board, which granted the General Counsel's motion for summary judgment by Decision and Order dated March 31, 2000. TradeSource was ordered, *inter alia*, to bargain on request with the Union and to furnish the Union with the requested information. This appeal followed.

II.

When presented with a representation petition, the Board is charged with the responsibility, and has broad discretion, to define the appropriate bargaining unit. *See NLRB v. Action Auto. Inc.*, 469 U.S. 490, 494 (1985); *Sandvik Rock Tools, Inc. v. NLRB*, 194 F.3d 531, 534 (4th Cir. 1999). In exercising this authority, the Board has historically focused on whether the employees sought to be included in a single bargaining unit share a sufficient "community of interest" to be

---

[2]Because an employer cannot obtain direct review of the Board's certification, a refusal to bargain is the "proper path to judicial review of the Board's election decision." *Rosslyn Concrete Constr. Co. v. NLRB*, 713 F.2d 61, 63 n.1 (4th Cir. 1983).

[3]TradeSource abandoned the challenge to Kierce's ballot.

included together. *See Sandvik*, 194 F.3d at 535. Among other things, the Board examines whether the employees have similar "employment benefits, hours of work, and other terms and conditions of employment."[4] *Sandvik*, 194 F.3d at 535 (internal quotation marks omitted); *Rosslyn*, 713 F.3d at 63 (noting that employees share a community of interest with other eligible employees if "they work side-by-side with other employees, receive commensurate wages, and share identical working conditions").

It is widely recognized, however, that "workers who have no reasonable expectation of working in the same workplace in the future cannot share a community of interest." *NLRB v. Trump Taj Mahal Assocs.*, 2 F.3d 35, 38 (3rd Cir. 1993). "The Board's responsibility is to identify a group of positions such that those serving in the unit can reasonably be expected to share a community of interest *over time*." *Id.* Thus, for example, casual or temporary employees of an employer who do not share the requisite community of interest with full-time or regular part-time employees are ineligible to vote in a representation election. *See Friendly Ice Cream Corp. v. NLRB*, 705 F.2d 570, 581 (1st Cir. 1983) (upholding Board's exclusion of two full-time college students who worked on a regular part-time basis during the summer, but had the intention of returning to school in the fall).

---

[4]Specifically, the Board examines twelve equally important factors to determine whether the employees share a sufficient "community of interest":

> (1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

*Sandvik*, 194 F.3d at 535 (internal quotation marks omitted).

A.

Although temporary employees and former employees who are not employed as of the eligibility date are not generally eligible to vote in a union election, special considerations in determining an appropriate bargaining unit arise in the context of the construction industry. Construction industry employment is by nature sporadic and temporary, such that many construction employees work for a number of different employers in any given year, with their employment ending with a lay-off or project completion. Thus, the Board adopted the *Steiny/Daniel* eligibility formula to ensure that a bargaining unit fairly represents all employees who have a legitimate "continuing interest in working conditions which would warrant their participation in an election to determine a representative for collective bargaining concerning the tenure and conditions of their employment." *Daniel*, 133 NLRB at 266. The formula enfranchises "all employees in the unit who have been employed for a total of 30 days or more within the period of 12 months, or who have had some employment in that period and who have been employed 45 or more days within the period of 24 months, immediately preceding the eligibility date for the election," *id.* at 267, provided they "have not been terminated for cause or quit voluntarily prior to the completion of the last job for which they were employed," *Daniel*, 167 NLRB at 1081.

Generally speaking, the *Steiny/Daniel* "formula serves as an easily ascertainable, short-hand, and predictable method of enabling the Board expeditiously to determine eligibility by adopting a period of time which will likely insure eligibility to the greatest possible number of employees having a direct and substantial interest in the choice of representatives." *Steiny*, 308 NLRB at 1325-26 (internal quotation marks omitted). Thus, for example, application of the formula will result in the inclusion of those employees who have been laid off in a reduction of force at the completion of a job but who nonetheless expect to return to employment when work again becomes available. By its express purposes, the formula "simply enfranchises employees who, although working on an intermittent basis, have sufficient interest in the employers' terms and conditions of employment to warrant being eligible to vote and included in the unit." *Id.* at 1328; *see NLRB v. Hondo Drilling Co.*, 428 F.2d 943, 945-46 (5th Cir. 1970) (rejecting challenge to similar eligibility formula calculated to enfranchise

former "roughneck" employees in oil drilling industry who, although not currently employed by the employer, had a legitimate continuing interest in the terms and conditions of employment in the bargaining unit).

### B.

Special considerations have also been recognized in the context of determining the eligibility of individual voters within a bargaining unit who have sought and obtained employment in their capacity as union organizers. The Board still applies the "community of interest" test, but takes into consideration an employee's underlying motives to ensure that the employee is not, in reality, one who has sought and obtained employment on a temporary basis only to achieve the goal of unionizing the workplace. *See Dee Knitting Mills, Inc.*, 214 NLRB 1041, 1041 (1974) (noting that while "an employee does not lose his status because he is also paid to organize," he may lose his eligibility to vote if "the employment itself was solely to organize, so that the employment is really only temporary, whether the employer knows it or not"). The exclusion rests upon the logical premise that such a "'temporary' employee [should] not [be] permitted to vote in a Board-conducted election because he or she does not have any longtime community of interest with the regular employees." *Anthony Forest Prods. Co.*, 231 NLRB 976, 977 (1977); *see also Multimatic Prods. Inc.*, 288 NLRB 1279, 1316 (1988).

Under current Board precedent, paid union organizers have been excluded from voting "either as 'temporary employees, or because their interests sufficiently differ from those of their coworkers." *Sunland Constr. Co.*, 309 NLRB 1224, 1229 (1992) (footnote omitted). If the evidence indicates that the "employment is solely for the purpose of union organizing," the employment is in reality "temporary in nature, [and] the individual so employed should not be included in the bargaining unit even though he or she otherwise enjoys the protection afforded employees by the Act." *299 Lincoln Street, Inc.*, 292 NLRB 172, 180 (1988) (excluding an employee from the bargaining unit, and refusing to count his authorization card toward the union's majority status, because the employment was found to be temporary; the employee's "only reason for securing employment . . . was to organize for the Union from within the work force" and the employment

was "designed to end on the completion of [the] union assignment."); *cf. NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 97 (1995) (noting that, while paid union organizers are employees protected by the Act, the Board has held that they "may not share a sufficient 'community of interest' with other employees (as to wages, hours, and working conditions) to warrant inclusion in the same bargaining unit").

### III.

With these precedents in mind, we turn to TradeSource's challenges to the ballots cast by Cassie, McKenzie, and Rourke. Trade-Source does not contest the general scope of the bargaining unit or that the Union employees met the *Steiny/Daniel* eligibility criteria adopted to define that unit. Nor does TradeSource dispute that the Union employees "work[ed] side-by-side with other employees, receive[d] commensurate wages, and share[d] identical working conditions." *Rosslyn*, 713 F.2d at 63. Rather, TradeSource asserts that the ballots cast by Cassie, McKenzie, and Rourke should be disqualified because the men sought employment with TradeSource for the sole purpose of unionizing the plumbers. As such, TradeSource contends, the men should be regarded as temporary employees who lack the requisite community of interest with TradeSource's other employees which would entitle them to cast a vote on the issue of unionization. *See Sunland*, 309 NLRB at 1229; *Lincoln*, 292 NLRB at 180.

The hearing officer rejected TradeSource's challenges to the ballots, finding that the men were not temporary employees and did not lack a community of interest with the other unit employees so as to render them ineligible to vote in the election. First, the hearing officer concluded that the employees met the *Steiny/Daniel* criteria and should not otherwise be considered temporary because they were never told that their employment would terminate on any particular date or upon completion of a finite work project. Second, the hearing officer opined that the temporary employment standard of *Lincoln/Sunland* only applied to paid union organizers, not voluntary union organizers. And, finally, the hearing officer found that these employees were out of work when they applied to TradeSource for employment and concluded that, because there was insufficient evidence that they sought employment with TradeSource solely to orga-

nize the employer, they should not be considered temporary employees under the *Lincoln/Sunland* line of cases.

Although offering no specific indication as to how it would apply its precedents in this area, the Board adopted the findings and recommendations of the hearing officer, noting that it found no merit to the contention that Cassie, McKenzie, and Rourke were ineligible to vote because they served as unpaid union organizers:

> The parties stipulated that these employees met the eligibility standard set forth in [*Steiny/Daniel*]. In addition, as found by the hearing officer, the record does not establish that these employees either were terminated for cause or had quit voluntarily prior to the completion of the last job for which they were employed. Thus, the Employer has not met its burden of showing that these were temporary employees ineligible to vote in the election.

J.A. 79. n.2 (citations omitted).

The Board is vested with wide discretion to resolve ballot challenges in a representation election. *See Friendly*, 705 F.2d at 580 (citing *NLRB v. A.J. Tower Co.*, 329 U.S. 324 (1946)). Thus, our review is restricted to an analysis of whether the Board has abused this discretion in rejecting the ballot challenges and certifying the election. *Id.*; *see also NLRB v. Boston Beef Co.*, 652 F.2d 223, 226 (1st Cir. 1981). In doing so, we must uphold findings and conclusions of the Board if they "are based on substantial evidence and the Board's consistent precedents." *Rosslyn*, 713 F.2d at 64; *see also Elizabethtown Gas Co. v. NLRB*, 212 F.3d 257, 262 (4th Cir. 2000); *NLRB v. Coca-Cola Bottling Co.*, 132 F.3d 1001, 1004 (4th Cir. 1997). In other words, our review is restricted to a determination of whether the Board abused its discretion or otherwise acted in derogation of its applicable precedents in concluding that these voluntary union organizers nevertheless shared a sufficient community of interest with the other plumbers in the bargaining unit so as to be properly included as eligible voters in the union election.

### A.

We consider first the Board's assertion that the "community of interest" test as applied to union organizers in *Lincoln* and *Sunland*

does not apply to construction industry employees who are found eligible to vote under the *Steiny/Daniel* criteria, as well as the related assertion that TradeSource should be prohibited from arguing that the men were ineligible to vote under the *Lincoln/Sunland* inquiry because it earlier stipulated to the application of the *Steiny/Daniel* criteria for voter eligibility and that the three challenged voters met the criteria.

In *Steiny/Daniel*, the Board set forth an eligibility formula designed to enfranchise former employees who have a reasonable expectation of future employment with the employer, and therefore a community of interest with the regular employees, but who happen not to be employed on the eligibility date because of the temporary nature of construction work. *See Daniel*, 133 NLRB at 266-67; *Steiny*, 308 NLRB at 1324-1326. The formula was obviously not intended to automatically enfranchise an employee who does not in actuality share a community of interest with other employees simply because he meets the minimum eligibility requirements. Indeed, a contrary conclusion would allow a union to pack an employer with employees whose "only reason for securing employment [is] to organize for the Union from within the work force," the precise result sought to be prevented by the Board's recognition that employees with such a motive should be disqualified from voting because they in fact *lack* the requisite community of interest with the other employees. *Lincoln*, 292 NLRB at 180. Unions would be able to send members to work for a non-unionized construction employer, even pulling them off union jobs with the express direction that they work for the non-union employer a minimum of 30 days and up to the expected lay-off, for the sole purpose of gaining eligibility to vote under *Steiny/Daniel* and, thereby, potentially force the employer's regular employees to accept the Union as their representative. Having reviewed the applicable Board precedents, we are satisfied that *Steiny/Daniel* and *Lincoln/Sunland* speak to quite different concerns and that the proffered application of them is not a reasonable one. Accordingly, we decline to enforce the Board's order on the overly-simplistic basis that construction employees who are qualified to vote in a union election because they meet the *Steiny/Daniel* formula for eligibility cannot be otherwise viewed as temporary employees who lack the requisite community of interest with the regular employees under the *Lincoln/Sunland* inquiry.

B.

We likewise decline to enforce the Board's decision on the proffered basis that the *Lincoln/Sunland* line of cases is only applicable to union organizers who have sought employment for the sole purpose of unionizing the workplace *and* who have received pay from a union for their organizing efforts. We do not read the Board's precedents so narrowly, nor the distinction as being a defensible one.

In *Lincoln*, the Board disqualified a paid union organizer from voting, not because he received pay for his efforts, but because "[h]is only reason for securing employment with [the employer] was to organize for the Union from within the work force" and because his employment "was designed to end on the completion of his union assignment." *Lincoln*, 292 NLRB at 180. In *Sunland*, the Board noted that:

> In determining whether statutory "employees" are eligible to vote, the Board applies a traditional "community of interest" test. Under this test, paid union organizers frequently are excluded from voting, either as "temporary" employees, or because their interests sufficiently differ from those of their coworkers. In short, employee status is not synonymous with voter eligibility. Accordingly, any concern over unions packing bargaining units with their paid functionaries is, in our experience and judgment, misplaced.

*Sunland*, 309 NLRB at 1229 (citations and footnotes omitted). Thus, the Board noted that paid union organizers had been excluded from voting in the past because they were viewed as "temporary" employees or employees whose "interests sufficiently differ[ed] from those of their coworkers," *id.*, not simply because they had been "paid" by a union to organize.

In sum, *Lincoln* and *Sunland* dealt with paid union organizers, but offer no indication that the Board rested the determination of whether a union organizer shares a community of interest with the other employees solely upon whether the union organizer receives a paycheck for his organizing efforts. And, in *Dee Knitting*, 214 NLRB at 1041, the Board rejected a challenge to the vote of a union organizer

because there was no evidence that she took the job solely to organize, even though she *was* paid to organize. The fact that a union organizer is voluntary should not enfranchise the voter any more than the fact that a union organizer is paid should automatically disenfranchise the voter.

Nor do we view the distinction as a defensible one. Pay is not the sole motivator for human action. Indeed, in this situation, the union organizers received permission to work at TradeSource if they agreed to act as voluntary organizers, allowing them to garner a paycheck for themselves *and* continue to advance on the Union's job referral list for a higher-paying job should one become available. Consequently, it could just as easily be said that the union organizers' "pay" was the permission to receive at least some income from a nonunion contractor, without penalty by the Union, while awaiting either an assignment to seek and obtain employment at yet another unorganized employer or the receipt of the preferred union-referred employment when it became available.

## C.

Finally, although we decline to enforce the Board's order on the bases proffered, we are nonetheless constrained to do so on the basis that TradeSource failed to meet its burden of showing that the sole motive of the three challenged voters was in fact to gain voter eligibility and organize TradeSource from within.

TradeSource contends that each challenged voter began employment with TradeSource with the sole intent to organize the employer by obtaining voter eligibility and that they intended to quit once organizing was completed. While conceding that there is no direct evidence to this effect, TradeSource argues that the conclusion is evident from the fact that the employees stopped working as soon as they had achieved eligibility and did not return when recalled by TradeSource after their lay-off.

While we agree that the evidence may be susceptible to a contrary conclusion, substantial evidence on the whole record also supports the conclusion that, although these employees were most assuredly motivated to organize the workplace, they did not seek and obtain employ-

ment with TradeSource with the sole motive to do so. When the organizing campaign at TradeSource began, the challenged employees were unemployed. They were hired, and legitimately gained eligibility to vote under the *Steiny/Daniel* criteria, but were ultimately laid-off from employment by TradeSource. By the time TradeSource recalled them, each had obtained alternative employment. There is no evidence that these employees resigned their employment with TradeSource or were otherwise instrumental in terminating their employment relationship with TradeSource. There is no evidence that the men were out of work and simply refused to return when recalled. There is no evidence that, had they not been laid off by TradeSource, they intended to or would have left TradeSource voluntarily as soon as the election was over. Nor is there any evidence that they would have refused to return to TradeSource had the election been unsuccessful. And, finally, there is no evidence that these employees had previously engaged in a practice of moving from one nonunion contractor to another, working only long enough to gain eligibility to vote and swing the election in the Union's favor, and then resigning or refusing to return upon a recall.

In summary, we are satisfied that there was substantial evidence on the whole record to support the conclusion that the challenged voters did not accept employment with TradeSource with the sole motive of organizing the workplace and gaining voter eligibility and, therefore, that the Board's order must be enforced.

## IV.

For the foregoing reasons, we deny TradeSource's petition for review and grant the Board's cross-application for enforcement.

*PETITION FOR REVIEW DENIED, AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED*